### UNITED STATES v. WEIRTON STEEL CO.
### No. 1060.

District Court, D. Delaware.
Feb. 27, 1935.

Frank K. Nebeker, Paul Williams, and William R. Benham, Sp. Assts. to Atty; Gen., Joseph M. Cohen, Sp. Atty., of Washington, D. C., and Leonard E. Wales, U. S. Atty., of Wilmington, Del.

Earl F. Reed, C. M. Thorp, Jr., John E. Laughlin, Jr., and Donald W. Ebbert (of Thorp, Bostwick, Reed & Armstrong), all of Pittsburgh, Pa., and Robert H. Richards and Caleb S. Layton (of Richards, Layton & Finger), both of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a suit in equity, brought by the United States against Weirton Steel Company, a Delaware corporation. The amended bill of complaint prays for a perpetual injunction enjoining defendant from violating the labor section of the Code of Fair Competition for the Iron and Steel Industry, approved by the President August 19, 1933. A motion for preliminary injunction was denied. United States v. Weirton Steel Co. (D. C.) 7 F. Supp. 255. On final hearing the testimony of 283 witnesses was heard in open court with opportunity for cross-examination.

Jurisdiction of the suit is conferred by section 3 (c) of title 1 of the National Industrial Recovery Act (15 USCA § 703 (c):

"Sec. 3. * * * (c) The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this title [chapter]; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

The Code of Fair Competition for the Iron and Steel Industry provides in article IV, § 1:

"(1) That employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection;

"(2) That no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing."

The National Industrial Recovery Act, § 7 (a), 15 USCA § 707 (a), prescribes as conditions of every code of fair competition the above-recited paragraphs.

## Pleadings.

In its bill of complaint plaintiff avers: "The provisions of the [steel] code confer upon the iron and steel industry and the members thereof, including this defendant,

many valuable privileges and advantages not theretofore enjoyed by them."

Plaintiff further avers: "The total capital stock of the defendant is owned and held by the National Steel Corporation, a holding company organized under the laws of Delaware. The properties of the subsidiary companies of said holding company constitute a completely integrated unit for the production of iron and steel with diversified lines of finished products and by-products. * * * Defendant's business and operations are an integral part of a stream of commerce originating with orders and contracts for coal, iron ore, and other raw products in various States which are shipped across State lines to defendant's plants to be processed, and which as processed are shipped across State lines and delivered, all in the current of, or affecting, interstate commerce, to defendant's customers for use or further fabrication. * * * Defendant's operations as above described are carried on, in large part, pursuant to specific contracts and orders and specifications thereunder, and the output of the defendant's plants is, in large part, designed and intended for immediate shipment and delivery to purchasers outside the State of manufacture. Steel products, as a rule, are not held in stock. The business of steel companies in general, and of the defendant in particular, is dependent in large measure upon the known ability to produce and ship without obstruction or delay. Because of the above considerations, obstruction of production in said plants directly interferes with and obstructs transportation and delivery therefrom, and thereby substantially obstructs, restrains and otherwise affects the flow of interstate commerce and tends to diminish the amount thereof. The denial of the right of employees to engage in collective bargaining as provided in the National Industrial Recovery Act and in the Code of Fair Competition for the Iron and Steel Industry, both as originally adopted and as amended, causes discontent and dissatisfaction, resulting in strikes and lockouts, which delay and obstruct the production of steel plants and shipment therefrom, and lead to the cancellation of orders by purchasers, all with the necessary result that the production, sale, shipment, and delivery of steel products in the course of interstate trade and commerce is substantially restrained, interfered with and obstructed."

Plaintiff further avers: "During the month of June, 1933, defendant, in anticipation of the adoption of the code and as a means of circumventing the rights of its employees to bargain collectively with their employers and to choose their own representatives for that purpose, formulated, initiated, and imposed upon its employees and at all times since has maintained and controlled the activities of a company dominated plan of employee representation. * * * Defendant has represented and continues to represent to its employees that said plan was adopted and is being maintained in compliance with the requirements of the National Industrial Recovery Act, and particularly for the purpose of enabling them to exercise the right of collective bargaining as guaranteed to them by the provisions of section 7 (a) of said Act and the same provisions as incorporated in said Code, whereas in truth and in fact said company plan of employee representation is wholly ineffective as a means of collective bargaining, and the same was adopted, has been and is being maintained by defendant in furtherance of a scheme to prevent its employees from organizing or joining a labor union for that purpose."

In other words, plaintiff avers that defendant formulated and unlawfully maintains a company-dominated plan of employee representation as a means of circumventing the rights of its employees to choose their own representatives for purposes of collective bargaining; and that the defendant represented and continues to represent that the plan of employee representation is a compliance with the provisions of the National Industrial Recovery Act.

Plaintiff further avers: "During the year 1933, a substantial number of defendant's employees joined a certain union known as the Amalgamated Association of Iron, Steel and Tin Workers of North America, and sought through said union to exercise the rights conferred by the above quoted provisions of the code; but defendant has refused and continues to refuse to meet with the representatives of such employees as so or otherwise selected, or discuss their problems or bargain collectively with them. * * * As a direct result of all of the activities of defendant alleged in this and the preceding paragraph hereof, and of the dissatisfaction of the employees resulting therefrom, a strike occurred at defendant's plants on or about September 26, 1933. Thereupon, the defendant closed down its plants for about two weeks, discontinued employment, ceased to manufacture

steel products and to make sales and shipments thereof, thereby discouraging the placing of purchase orders, and causing the cancellation of existing purchase orders. As a result thereof, the ordinary flow of interstate commerce in such products was substantially obstructed."

In other words, plaintiff avers that a substantial number of employees of defendant joined the Amalgamated Association and sought through that union to exercise the rights conferred by section 7 (a) of the National Industrial Recovery Act, but that the defendant refused and refuses to meet with and bargain collectively with such representatives, and that as a result of the various activities of the defendant as alleged, a strike occurred on September 26, 1933, obstructing and interfering with interstate commerce.

Plaintiff further avers that the defendant refused to permit the National Labor Board, as agreed, to hold an election of the employees of the defendant in order to express a choice between the Amalgamated Association and the company plan of employee representation.

Plaintiff further avers: "As a means of perpetuating said company dominated plan and of effectuating said scheme to deprive its employees of the rights guaranteed by the above quoted provisions of the code, and for the purpose of compelling its employees against their will to accept said company dominated plan and to refrain from organizing or joining a labor organization for the purpose of securing the benefits of the above quoted provisions of the code, and for the further purpose of compelling such of its employees as had joined the Amalgamated to withdraw therefrom, the defendant has employed and continues to employ various measures of coercion, intimidation and interference, including discharges, layoffs, demotions and changes in conditions of employment and threats thereof."

In other words, that in order to perpetuate a company-dominated plan and to deprive the employees of their lawful rights with respect to collective bargaining and to refrain from organizing or joining a labor union of their choice, and to compel such of its employees as have joined the Amalgamated Association to withdraw therefrom, the defendant has employed various means of coercion, intimidation, and interference, as alleged, and, unless restrained therefrom, the defendant will continue such measures.

Plaintiff further avers: "The defendant purposes, intends and threatens to restrain, interfere with and coerce its employees in the manner, for the ends and by the means, methods, acts and conduct hereinbefore alleged, and unless enjoined from so doing by this Honorable Court, defendant will continue to compel its employees to accept and submit to said company dominated plan and to refrain from organizing or joining a labor union as a means of collective bargaining through representatives designated by them without interference, restraint or coercion of defendant or its agent."

Plaintiff prays that defendant be perpetually enjoined:

"(1) From representing or holding out to its employees, or any of them, that the company dominated plan of this defendant is an effective means of collective bargaining;

"(2) From representing or holding out to its employees, or any of them, that the so-called representatives elected under the company dominated plan are free from company influence and domination;

"(3) From making any payments whatsoever for the account or in aid of the company dominated plan, or to or for the account of the representatives elected thereunder, other than the payment of their regular wages as employees;

"(4) From in any way, directly or indirectly, through the means described in this Amended and Supplemental Bill of Complaint, or otherwise, obstructing, impairing, restraining, or interfering with the right of any of defendant's employees; (a) to organize and designate representatives; (b) to bargain collectively with the management through the representatives so designated; (c) to organize and maintain, or to join and maintain, any labor union or labor organization they may see fit to organize or to join for the purpose of engaging in concerted activities as a means of collective bargaining or other mutual aid or protection;

"(5) From in any way, directly or indirectly, through the means described in this Amended and Supplemental Bill of Complaint, or otherwise, requiring any employee or anyone seeking employment, to submit to the company dominated plan or to participate in any of its activities, or to refrain from joining, organizing or assisting a labor organization of his own choosing;

"(6) From discharging, laying off, transferring or changing conditions of employment of any of the defendant's employees;

or threatening so to do, on account of union affiliation or activities, or for opposing the company dominated plan;

"(7) From refusing, or threatening to refuse, to meet, confer or bargain collectively, with such person, or persons, or organization as the employees or any specific group of employees may designate to represent them;

"(8) From announcing to its employees, or in any manner giving them to understand, that it will close its plants rather than to recognize or deal with the Amalgamated or its agents, if selected, as the designated representatives of the employees;

"(9) From compelling its employees, or any of them, as a condition of employment to submit to or join said company dominated plan."

In its answer defendant denies all the material averments of the amended bill of complaint.

The defense is twofold: (1) On the facts the preponderance of evidence is against the plaintiff; and (2) section 7 (a) is unconstitutional if construed to apply to defendant.

### The Defendant.

Nearly thirty years ago Ernest T. Weir and his brother, D. M. Weir, with J. C. Williams, organized the defendant and acquired the plant of Phillips Sheet & Tin Plate Company at Clarksburg, W. Va. In 1910 defendant purchased several farms in the Ohio valley, now the site of the town of Weirton, and began building its Weirton plant. In 1912 the defendant purchased the Pope Tin Plate Company at Steubenville, Ohio.

E. T. Weir, chairman of the board of directors of defendant, started in the steel business as a boy in 1893 and worked in various departments of steel mills before organizing defendant. Williams, president of defendant, started at the age of thirteen in a steel mill in Wales where he remained until he was twenty. While in the Welsh mill, he worked in every department. For the next two years he was a steel hand in Italy. On his twenty-second birthday he came to this country and worked in steel mills in Indiana, Michigan, Wisconsin, and West Virginia until he became associated with E. T. Weir as his assistant in 1904. These founders of defendant rose from the ranks and knew from personal experience every job in the mills. For thirty years they lived at the mills with their men and saw the operations grow from year to year. They are respon-

sible for the present size of the plants, the volume of production, and the choice of the entire personnel of the management. Below the president and chairman of the board are the vice presidents, general superintendents, general manager, managers of the six mills, and the superintendents in each mill with several hundred foremen and subforemen. In addition to these, there are the engineering, mechanical, and electrical divisions and the department of industrial relations. From a tract of farm land with two buildings, Weirton has grown into an unincorporated community of 25,000 people. Defendant supplies without charge fire protection, garbage disposal, street cleaning, street paving, street lighting, and playgrounds to the inhabitants, chiefly workmen and their families. It also maintains hospital and medical facilities. From the beginning, there has been an intimate personal relationship between the management and the workmen.

Defendant is engaged in manufacturing iron, steel, and tin products and by-products. It owns and operates three plants situated at Weirton, W. Va., Clarksburg, W. Va., and Steubenville, Ohio. The Weirton plant is situated near the Ohio river and extends for a distance of $1\frac{1}{2}$ miles. It comprises wharves, transportation facilities, buildings, machinery, and equipment necessary in its manufacturing business. The Steubenville plant with 1,000 employees is in Steubenville near the Ohio river and 4 miles from Weirton. It consists of a tin mill for the manufacture of tin plate from slabs and bars of unfinished steel manufactured at Weirton and transported by independent carriers to Steubenville for fabrication and finishing. The finished product of Steubenville is delivered to independent carriers for transportation to the customers of the company. The Clarksburg plant with 1,200 employees is in the outskirts of Clarksburg, 135 miles from Weirton. Like Steubenville, it consists of a tin plate mill for the manufacture of tin plate from unfinished steel manufactured at Weirton and transported by independent carriers to Clarksburg for finishing. The finished product of Clarksburg is delivered to independent carriers for transportation to customers or is transported by such carriers to Weirton.

The Weirton plant with approximately 10,000 employees comprises four departments—steel works, with 3,000 employees; sheet mill, with 800 employees; strip steel department, with 3,000 employees; and tin

mill, with 2,800 employees. The steel works department consists of certain subdivisions designated coke plant, open hearth department, blooming mill, and structural mill. The function of the steel works department is the manufacture from raw materials of unfinished steel. Coal is brought into the coke plant where it is manufactured into coke. This coke with iron ore and limestone is transformed into pig iron in the blast furnaces of the steel works department. Pig iron is transported in a molten condition to a mixer in the open hearth department from which it is removed from time to time and charged with ore, scrap, and limestone into the open hearth furnaces and there transformed into molten steel, tapped, and cast into ingots. The ingots produced in the open hearth department of the steel works are transported to the blooming mill, where the molds are removed and ingots after being reheated are rolled into bars, billets, or slabs of unfinished steel and distributed to the bar and slab yards for transportation to the various finishing departments in the company's units at Weirton, Clarksburg, and Steubenville. The finishing departments at Weirton—the tin mill, sheet mill, and strip steel department—manufacture the unfinished slabs, billets, and bars into finished iron, steel, and tin products. During the manufacture of bars, billets, and slabs of unfinished steel from raw materials, neither the materials nor the labor in the manufacture of the materials is in interstate commerce. During the manufacture of finished products in the finishing mills at all the plants, neither the products nor the labor in the manufacture of the products is employed in interstate commerce.

Defendant is a wholly-owned subsidiary of National Steel Corporation. With its subsidiaries, National Steel Corporation constitutes a well integrated organization for the production of iron and steel. The principal subsidiary companies beside the defendant are Great Lakes Steel Corporation, Hanna Iron Company, Hanna Iron Ore Company, Producer Steamship Company, and Weirton Coal Company. One of the Hanna companies owns and operates iron mines in Michigan, Wisconsin, and Minnesota. The defendant obtains over 50 per cent. of its iron ore from the Hanna Iron Ore Company. The Producer Steamship Company operates steamers upon the Great Lakes transporting ore from the upper lake to the lower lake ports from which the ores are transported by rail to Weirton. This company carries about 1,500,000 tons per year, 45 per cent. of which goes to defendant. The defendant uses all the coal produced by the Weirton Coal Company at its mines in Pennsylvania. In 1933 defendant received 1,305,955 tons of coal and 836,428 tons of iron ore. Defendant uses between 50,000 and 60,000 tons of scrap iron per month. All of the iron ore and most of the scrap and coal moves across state lines from sources of supply to defendant's plants. In 1933, 577,976 gross-tons of steel products were manufactured at defendant's plants, 99 per cent. of which was transported across state lines to customers.

## Collective Bargaining.

In the spring of 1933 emergency legislation for industrial recovery was actively discussed in Congress and the public press. The proposed legislation recognized the temporary right of capital to engage in co-operative action by way of fixing prices and regulating production exempt in part from the restraints of the Sherman Act (section 1 et seq. [15 USCA § 1 et seq.]) and Clayton Acts (section 1 et seq. [15 USCA § 12 et seq.]). In compensation therefor and as a counterbalance, labor strongly urged that the provisions of the Railway Labor Act (45 USCA §§ 151–163) concerning the right of labor to organize and bargain collectively free from interference be accorded to labor in the proposed industrial legislation. In deference and submission to this demand, Congress included section 7 (a) in the National Industrial Recovery Act.

The agitation in Congress and throughout the country aroused Weir to the situation at Weirton where no plan or provision for collective bargaining had ever prevailed. Relations between the management and the employees heretofore had been handled on an individual basis. When a man or group of men had a grievance to discuss, they discussed it with the management's representatives in the mills, and, if not adjusted to the satisfaction of the men, they went to the office of the company and took the matter up there. In anticipation of legislation on the subject, Weir consulted Eugene R. Grace, president of Bethlehem Steel Corporation, and obtained from him a copy of the Bethlehem Plan of Employee Representation. He also consulted with the heads of other large companies in the steel industry and obtained copies of their plans. He was attracted by the Bethlehem plan which had been in operation for over fifteen years

among 70,000 employees in its steel plants, and had established satisfactory and peaceful relations with its workmen. Collective bargaining as prescribed in the plan and practiced at the plants of the Bethlehem Company through many years had proved an effective means of satisfying reasonable demands of labor and developing the principle of co-operative relations between management and workmen. Weir turned the plan over to Williams who submitted it to the employees. The problem was the practical mode of submitting the plan to 13,000 employees, 6,000 of whom were foreigners and all of whom were scattered in mills located in three towns operating twenty-four hours a day with five shifts of eight hours each. Obviously, mass meeting methods applicable to small mills with a few men were out of the question. At least 40 per cent. of the workmen were foreign born. In certain mills practically all were foreign born. These workmen were of eleven different nationalities and many of them are unable to read, speak, or understand English.

For eight years there had been in effect at Weirton a group insurance plan known as the Employees' Relief and Beneficial Association with a board of directors, seventeen of whom were elected by the employees by secret ballot. One obvious means of direct communication with employees was through these directors. Williams discussed the plan with the company's managers and superintendents and instructed them to reach the employees through the acting and past directors of the beneficial association, and also through foremen and recognized leaders among the men. The managers requested the leaders to select from their own number men fitted to discuss and explain the problem of employee representation to the employees and ascertain their views. The men so selected formed themselves into steering committees in each mill for that purpose. Each committee organized and considered various plans of employee representation made available by the managers

or by members of the committee or other employees, such as plans in force at the Wheeling Steel Company and at the different Bethlehem plants. The committees undertook to explain the plan to other employees and with the foremen and superintendents reported to the management that the men approved the Bethlehem plan. General knowledge of the Bethlehem plan before it was acted upon by the employees was proved by 91 witnesses. It is significant that the testimony of these witnesses showed there was practically no opposition to the plan. This is further confirmed by the fact that no other plan of representation was even suggested. After reports of the steering committees, the following notice was posted in the mills on June 22, 1933:

"Beginning July 1st the Employees' Representation Plan will be adopted by the Weirton Steel Company. This plan will provide more effective communication and means of contact between the management and employees on matters pertaining to industrial relations and conditions under which the employee will work.

"J. C. Williams, President."

On the same day defendant ordered 15,000 copies of the Bethlehem plan printed with slight modifications to adapt it to the Weirton plant and on June 24 they were distributed throughout the mills so that each employee received a copy. The steering committees also undertook to hold an election for the purpose of selecting representatives under the plan and to that end formed themselves into election boards for each mill. Also on June 22 notices were posted in each mill of the plant naming the employees selected by the steering committee as the election board for that mill to serve at the nomination election on Tuesday, June 27 and at the general election on Friday, June 30. As an example of an employee election board named by a steering committee, the notice posted in the Strip Steel Works appears in note 1. Before the

---

NOTE 1.

For Company Use Only.

Weirton Steel Company.

June 22, 1933.

Strip Steel Department.

To: ——

From: ——

Subject: ——

In line with President Williams' letter of June 22, announcing the inauguration of a plan of Employees Representation,

the following list of employees of the Strip Steel Department have consented to act as a temporary committee on election:

| | | |
|---|---|---|
| Joe Gaylord | Check #3715 | 48" Hot Mill |
| Joseph H. Davis | Check #2152 | 48" Hot Mill |
| Walter Bodortha | Check #2051 | 48" Hot Mill |
| Jacob Kwalton | Check #3081 | 48" Cold Mill |
| Lenard Costello | Check #3305 | 48" Cold Mill |
| John Larkin | Check #3005 | 48" Cold Mill |
| George McClelland | Check #1326 | Mechanical |
| Albert McDonald | Check #3877 | Mechanical |
| Gordon Yost | Check #1301 | Mechanical |

nomination election, defendant posted still another notice stating the qualifications of voters, the qualifications of candidates for representative, describing the method of nomination and the method of election. This notice appears in note 2. Defendant provided the facilities for the elections, but neither the company nor any officer had anything whatever to do with choosing any one who acted either as judge or clerk on any of the election boards. Slates were formed in every mill and there was the keenest interest in the nomination and election of rival candidates. In round numbers 85 per cent. of the employees eligible to vote participated in the June elections.

Any evidence of coercion or interference at the June elections was trifling and not worthy of mention. Forty-nine representatives and alternates were declared elected. The election boards functioned fairly. No one has challenged the accuracy of the count or the honesty of the election officers at every polling place. The participation of over four-fifths of the eligible employees in the June elections was a conclusive expression of approval and adoption of the Bethlehem plan. It was the general understanding among the employees participating in the elections that the representatives elected would hold office for a period of six months from July 1, 1933, and that their successors would be elected in December, to take office on the first of the year. Following the election, the 49 representatives immediately met and elected a chairman and secretary and other committees. From the 49, the 6 divisional committees were selected by each department. Although the plan provided for joint committees consisting of representatives and management, the testimony shows that in actual practice the management never appointed any one on these joint committees. Williams testified:

"When the election took place in June, the representatives were organized. * * * I did not appoint anyone on any joint committee that they had, and I left it entirely to themselves. * * *

"XQ. Did you say this in your testimony: 'We as a company have no more to do with the management of the employees' representative plan than we have with the

| John A. Polen | Check #4112 | Electrical |
| Roy Lantz | Check #1417 | Electrical |
| Earnest L. McDevitt | Check #682 | Strip Steel Hot Mill |
| Charles Batting | Check #625 | Strip Steel Hot Mill |
| Joe Steimer | Check #1167 | Strip Steel Hot Mill |
| Andy Billy | Check #144 | Strip Steel Cold Mill |
| Adolf Bohler | Check #7 | Strip Steel Cold Mill |
| Leory Rairigh | Check #4 | Strip Steel Cold Mill |

A copy of the plan of Employees Representation will be in the hands of all employees before the nomination election which will be held on June 27, 1933.

I sincerely hope that every employee of the Strip Steel Department will cooperate with this committee in their efforts to complete this organization, and give wholehearted support to the plan.

Yours very truly,

Weirton Steel Company,

Geo. W. Vreeland,

General Superintendent.

NOTE 2.

First Elections

Employees' Representatives

Weirton Steel Company.

Employees of the Company, employed 60 days or longer, are qualified to vote except those in supervisory positions.

Candidates for representatives must have been employed by the Company one year or longer, be American citizens and 21 years of age or over.

Lists of those qualified to vote and to be elected representatives will be posted at the polls.

The election tellers will lend such assistance as may be required by a voter at the polls.

Nominations.

Nominations for Representatives will be held Tuesday, June 27, 1933. On the day of nominations each qualified voter will be furnished at the polls with a ballot on which he shall write the names of those whom he desires to nominate. The number to be nominated will be stated on the ballot.

Those receiving the highest votes shall be declared nominated.

Elections.

Election of the Representatives will be held Friday, June 30, 1933. On the day of election each qualified voter will be furnished a ballot on which the names of the nominees will be printed. The number to be voted for will be stated on the ballot.

Nominees receiving the highest votes shall be declared elected as Representatives. Nominees failing of election shall stand as alternates.

The ballots will be counted by Employees' Temporary Committee on Elections, who will then post names of successful candidates.

All qualified voters are urged to vote at the Nominations and Elections and contribute in every way to their success.

Weirton Steel Company.

Amalgamated Association'? A. I reiterate that.

"XQ. That is your statement? A. And it is a true statement."

This testimony of Williams is fully borne out by the record. During the summer of 1933, the committee of 49 and the divisional committees functioned effectively and adjusted many grievances. Harmonious relations prevailed. Within a fortnight, seeds of discord were planted. Organized labor took notice of the Weirton situation.

### Amalgamated Lodges.

The Amalgamated Association of Iron, Steel, and Tin Workers of North America is a labor organization composed of a small percentage of the workers employed in the manufacture of iron, steel, and tin products. Two organizers of this association appeared in the Ohio Valley. Romanogli went to Clarksburg. Bowen was dispatched by the association to Weirton and Steubenville. Their mission was to organize the employees into Amalgamated lodges and to enlist them to become members of the Amalgamated Association. These organizers were paid salaries and expenses and were directed to obtain from each prospective member an initiation fee of $3 to be remitted to the National office. Aside from the testimony of Long that he consulted with Bowen before the latter had been assigned to organize Weirton and Steubenville, it is clear from the evidence that the employees of defendant did not request the Amalgamated Association to organize lodges or to send organizers for that or any other purpose. The Amalgamated Association undertook this task on its own initiative and for its own purposes. Large numbers of employees at defendant's plants were induced to sign membership cards and many paid to the organizers all or part of the initiation fee of $3. This membership was procured in the main by misrepresentation and extravagant promises. A circular widely distributed by the organizers appealed to the steel workers in these terms:

### "AMALGAMATED ASSOCIATION OF IRON, STEEL AND TIN WORKERS.

"To THE STEEL WORKERS:

"Under the Industrial Recovery Act, the workers of the Steel Mills are CHALLENGED BY THE PRESIDENT OF THE UNITED STATES TO BECOME MEMBERS OF A LABOR ORGANIZATION.

"WILL YOU BE A SLACKER, or are you going to help him bring back the economic security of the steel workers? You can do this by complying with Section 7 of the Industrial Recovery Act.

"This Act gives to the employees the right by law to help themselves:

"Section 7: 'THAT EMPLOYEES SHALL HAVE THE RIGHT TO ORGANIZE AND BARGAIN COLLECTIVELY THROUGH REPRESENTATIVES OF THEIR OWN CHOOSING, and SHALL BE FREE FROM THE INTERFERENCE, RESTRAINT, OR COERCION OF EMPLOYERS OF LABOR, OR OTHER AGENTS, IN THE DESIGNATION OF SUCH REPRESENTATIVES, OR IN SELF ORGANIZATION, OR IN OTHER CONCERTED ACTIVITIES FOR THE PURPOSE OF COLLECTIVE BARGAINING OR OTHER MUTUAL AID OR PROTECTION; THAT NO EMPLOYEE AND NO ONE SEEKING EMPLOYMENT SHALL BE REQUIRED AS A CONDITION OF EMPLOYMENT TO JOIN ANY COMPANY UNION OR TO REFRAIN FROM JOINING, ORGANIZING, OR ASSISTING A LABOR ORGANIZATION OF HIS OWN CHOOSING; and that EMPLOYERS SHALL COMPLY WITH THE MAXIMUM NUMBER OF HOURS, MINIMUM RATES OF PAY, AND OTHER CONDITIONS OF EMPLOYMENT, APPROVED OR PRESCRIBED BY THE PRESIDENT.'

"Your employer cannot discharge you for joining the Amalgamated Association of Iron, Steel and Tin Workers.

"Meeting at ——

"Town ——."

This circular was false and misleading. There was no demand on the part of the President that any one join a labor organization. There was no warrant for branding as a "slacker" a man who refused to join a labor organization.

About the middle of July, 1933, Romanogli went to Clarksburg at the request of a committee of coal miners, potters, and members of other unions, not one of whom was a steel worker. He was met by the committee July 16 and taken to a Sunday afternoon meeting that had already been arranged. He talked about the Amalgamated Association and answered questions from the audience. He invited all interested to sign slips of paper as formal pledge cards provided by the association had not then been received. Before adjournment, arrangements were made to hold a meeting on the following Sunday, July 23. Meanwhile Romanogli communicated with the International office at Pittsburgh and arranged for Leonard, the National secretary, to address that meeting. Romanogli opened

headquarters and on the following day was visited by three steel workers—Guice, Milstead, and Murray. At the meeting on the following Sunday, Leonard reviewed the organization and work of the Amalgamated Association. "He asked those present if they were willing to join the Amalgamated Association. Unanimously the assemblage showed their intention in so doing. So an organization was instituted at that time." Temporary officers were installed. The organization thus instituted was Blue Eagle Lodge No. 32. The temporary officers were made permanent on the following Sunday.

At the end of the meeting, numerous steel workers signed pledge cards like the following:

"Membership and Pledge Card.

"Amalgamated Association of Iron, Steel, and Tin Workers of North America.

"As an Employee of the ——— I, the undersigned, accept membership in the Amalgamated Association of Iron, Steel and Tin Workers of North America, with offices in the Iron, Steel and Tin Workers' Building, 500 South Main Street, Pittsburgh, Pa., as the only union having jurisdiction in the iron, steel, sheet and tin mills through the American Federation of Labor. I take this action voluntarily and of my own free will, without influence or coercion on the part of anyone, and pledge every effort at my command to make my organization effective in the mill in which I work. I pledge myself to help organize the men at the mill where I work.

"Signature ———
"Address ———
"Name of Mill ———
"Town ——— State ———
"Date ———, 19——."

(Allied Printers' Label No. 43)

Pursuant to the pledge, the officers of the lodge, certain steel workers, and the organizers procured signatures to numerous other pledge cards. By the end of July, holders of pledge cards paid their initiation fee of $3 and received a pink card acknowledging the receipt thereof. This pink card was evidence of the holder's status as a member of the Amalgamated Association. The organization at Clarksburg was typical of the organization of the five lodges at Weirton and the one lodge at Steubenville. By the middle of September, a large majority of the employees of defendant had been induced to sign pledge cards and to pay $3 or part thereof and to accept pink cards. The membership of the seven lodges may be briefly summarized as follows:

| | |
|---|---:|
| N. R. A. Lodge No. 35 (Weirton).. | 1,958 |
| Goodwill Lodge No. 39 (Weirton).. | 263 |
| Weir-Cove Lodge No. 30 (Weirton) | 2,473 |
| Valley Lodge No. 31 (Weirton).... | 693 |
| New Deal Lodge No. 33 (Weirton) | 1,735 |
| Blue Eagle Lodge No. 32 (Clarksburg) .......................... | 949 |
| Steubenville Lodge No. 150, Ohio... | 706 |
| Total | 8,777 |

The situation presents an interesting query. How was this membership assembled? The answer to this query is made by 38 witnesses called by the defendant who testified that they took out cards in the Amalgamated Association under pressure and coercion. This is attempted to be offset by 6 witnesses called by the plaintiff who testified that they joined of their own free will. A few of the defendant's witnesses may be quoted.

Mason, a heater, testified:

"Q. Was anything told you as to the necessity for your signing the card? A. If I expected to work, I would have to sign a card and the charter would be closed and the dues raised shortly.

"Q. Is that why you signed it? A. Absolutely."

Lafferty, a roller, testified:

"Q. Will you state the reason why you joined the Association? A. My reasons for joining the Amalgamated Association were that I was not financially able to pay a $50 fee to get into it, and I could get into it for $3; I could better afford to lose $3 than I could $50.

"Q. Who mentioned any $50 fee? A. They told me that if I didn't join the Amalgamated Association before the charter was closed, that it would cost me $50 to get in.

"Q. Who told you that? A. Harry Dean, A. W. Peat, Henry Lesher.

"Q. Were they Amalgamated organizers? A. They were not what you would call organizers, but they were working for the organization."

Collins, a roller, testified:

"Q. You stated that you joined the Amalgamated Association? A. I did, yes.

"Q. Will you state what lodge you did join of the Amalgamated? A. Well, in the last part of August, I attended an open meet-

ing of the Amalgamated, and they were discussing dues, and one thing and another, and they said that—it was brought up by a resolution, which was brought before the lodge, that they were going to close the charter right away, and anyone that had not paid in their dues up then, would be assessed $50. So I did not at that night, and the next day, coming down through the mill, Emil Walters, a fellow by the name of John Rawlins was coming down, and they says, 'Tom, are you going to sign up?' I said, 'I don't know, it looks like as if I am going to have to.' John Rawlins said, 'If you are not, your iron is not going to be sheared next week.' I said, 'What do you mean by that?' He said, 'Practically every roller in the plant has signed up, and the majority of them—those rollers that are not signed up by next week are not going to have their iron sheared.' Well, I says, 'In that case, then, it looks like I will have to.' He said, 'You certainly are.' He says, 'If you are not in on the line by next week, by next midnight,' he says, 'I am afraid you won't have your iron sheared.'

"Q. Were you dissatisfied with the employee representation plan at that time? A. I was not."

Kinty, a tinner, testified:

"Q. Was anything said to you as to what would happen if they got 51 per cent. of the workers in the Amalgamated? A. Yes, sir; they told me that the U. S. Government would be back of this A. A.

"Q. What do you mean by the A. A.? A. This Amalgamated Union.

"Q. The Amalgamated Association? A. Yes, sir. They said when the President would get behind their back, it would bring all the boys home.

"Q. Was any statement made to you with respect to the recognition of the Amalgamated Association and what would happen if they came to you? A. They said if the ones did not have a card and unrecognized, they would have no job.

"Q. What did you understand by the phrase 'recognition of the Union' to mean? A. That means closed shop.

"Q. Is that the general understanding among steel workers? A. Yes, sir."

Reardon, a roller, testified:

"Q. Why did you join the Amalgamated? A. I was working there and there was a lot of agitation going around this way and that way, and they were right after me all the time because they figured if they could get me to join the Amalgamated, they would have a lot of my following to join, but nevertheless I was approached by a heater in the mill, Tom Buccey by name, and he said, 'We have every roller in the mill now joined but you. It is up to you to join.' I said, 'Tom, I do not know. I belonged to it before and I know what it is and I do not think I will.' He said, 'Let me know before the turn is over.' He came back in two heats' time, and said, 'What are you going to do?' I said, 'I do not know.' He said, 'Listen, Bill, if you do not join tonight,' he says, 'your iron will not be open on Monday morning.'

"Q. What do you mean by that? A. Well, my iron is my finished product. That is what I get paid for. I work on a tonnage basis, not only me but my crew.

"Q. Well, when he said that your iron would not be opened, what did he mean? A. He meant that the man that shears my iron and the three boys that opens my iron would refuse to open it, because I was not a member of the Union.

"Q. You joined the Union then? A. Yes, sir."

Miller, a rougher, testified:

"Q. Did you join the Amalgamated Association? A. I did.

"Q. Why? A. Because I was told I would lose my job if I didn't.

"Q. Who told you that? A. Mr. States.

"Q. Is he active in the Amalgamated Association? A. He was at that time.

"Q. When did you join? A. I am not definitely positive what date it was. It was a Saturday, either the 20th or 27th of August.

"Q. Was any statement made to you as to any increase in the initiation fee? A. Yes.

"Q. What? A. Mr. States also told me if I didn't join at a certain time that the increase in initiation fee would amount to $25.

"Q. Did you ever belong to the Amalgamated Association before that? A. No, sir."

Bailey, a heater, testified: "I was working there one day, so I was in back of the furnace and I was talking to Fred Lewis and Fred said to me, 'Have you signed a card yet?' I said, 'What card?' 'Why,' he said, 'Union card.' I said, 'No, sir.' He said, 'I have a card.' He said, 'Wouldn't you like to throw out one?' He said, 'It is going to be a closed shop.' I hadn't heard

anything about Union, practically, I did not know anything about unionism, so I said, 'Let me see one of your cards.' So he showed me the card. I looked it over. I said, 'No, I don't believe I want to join; I don't have any money to spend.' I says, 'I belong to one lodge.' He said, 'It is going to be a closed shop,' and he said, 'If you don't have a card, you won't be allowed to work,' and he said, 'You won't have any job.' I said, 'I don't want to lose my job; I got a family to keep; I want to work.' He said, 'You fill this card out,' and I says, 'All right, I will fill it out when I get it.' So I filled out the card and just in a day or two he told me to see Long. I seen Mr. Long on his mill. He gave me my card. I paid him the money."

DiStefani, a shearman, testified:

"Q. Did you join the Amalgamated Association? A. Yes, sir.

"Q. Why? A. I worked right alongside the fellow that was Chairman.

"Q. Chairman of the Amalgamated Association? A. I worked under Jimmy Coad.

"Q. What did he say about it to you? A. I kept talking to him all the time about it, and he would call the fellows over and tell them to join, and tell them to pay up their dues, and later on, I told him, I said, 'What if I don't join, then what?' He said, 'If they don't join it now and are recognized, it will cost them a fine of $50.' I said, 'Well, if they don't join it anyway, what are they going to do then?' He said, 'They will be out of a job.'"

Misrepresentation, threats of closed shop, and increase in initiation fees is thoroughly borne out by a great preponderance of the evidence. The threat to raise initiation fees is further corroborated by a contemporary minute of a meeting of August 24, 1933, of the Clarksburg lodge as follows:

"The matter of closing the Charter was again brought up and also a plan of raising the initiation fee of $3.00. A suggestion was then made by a brother that we hold up the closing of the Charter and allow a little more time to the employees not already in the organization. Also to the ones that have signed pledge cards but have not paid anything of their initiation fee. A resolution was then passed by the girls to levy initiation fees of $25 to girls who are holding back. A motion was made and seconded that the Charter be closed Aug. 31. The men set their initiation fee at $50. These initiation fees to go into effect after Aug. 31, 1933. Motion to close Charter on Aug. 31 was carried. Motion was then made that the meeting adjourn until Thursday, 8:00 P. M., Aug. 31, 1933.

"Minutes approved.

."Roy E. Guice, Secretary."

The testimony shows that initiation fees were paid only in part or not at all by a large percentage of the holders of the hundreds of cards produced. Finally, the testimony of an official of the Amalgamated Association reveals that in October, 1934, only 183 employees of defendant who had taken out cards from the local lodges were recognized as members of the association in good standing. From all the evidence relating to the organization of the lodges, it is clear that procuring the cards by employees falls far short of designating the Amalgamated Association as their bargaining agent.

Throughout the summer of 1933 the employees of defendant used the Bethlehem plan and found it an effective means of bargaining with defendant and of adjusting grievances. Committees of the 49 representatives dealt with the defendant in 181 different matters between July 1 and October 1, 1933, pertaining to wages, hours, and working conditions. All matters brought to the attention of defendant by these committees received prompt attention and were adjusted satisfactorily. With this experience with the committees of its employees defendant posted in September, 1933, the following notice:

"For Company Use Only

"Weirton Steel Company

"To : ———
"From : ———
"Subject : ———

"Notice

"The Weirton Steel Company plants are operating under the Code of Fair Competition of the Iron and Steel Industry. Hours of labor have been adjusted and wages have been increased to meet the full requirements of the Steel Code as pertaining to the Eastern District in which the Clarksburg Plant is located.

"According to the plant [plan] of Employees' Representation, Article 9, under the caption 'Procedure for Adjustments,' makes provision for the settlement of any dispute which may arise between employees and the management. Clause 3 states:

" 'If the General Joint Committee on appeals shall fail to effect a settlement, the President of the Company shall be notified, and the matter may be referred, if the President and a majority of the Employees' Representatives on the General Joint Committee agree to such reference, to an arbitrator or arbitrators, to be determined at the time according to the nature of the controversy.'

"The Weirton Steel Company wishes to do their part to end this depression and intends to live up to the N R A and the Iron and Steel Code in every respect. Beyond this we cannot go, and if any employees have any grievances they will have to be settled in accordance with Clause 3, Article 9 of the Employees' Representation Plan as quoted above.

"Weirton Steel Company.
"September 11, 1933."

### Strike for Recognition.

On Sunday, September 24, without any previous warning or demand, 39 men out of a total of 91 employed in the tin plate cold rolled department failed to report for work at midnight. A group of a few workers stationed at a mill entrance persuaded these 39 not to go to work. The next two crews reported for work as usual. The following night the men who remained away from work on the first shift entered the mill and demanded that the 52 men who had worked the night before be discharged because they had worked instead of remaining out with the other 39. This demand was refused by the foreman. The men then left work, stationed themselves at the entrances to the mill, and persuaded other employees not to report for work at the next turn. The result was that certain parts of the mill were completely tied up. The strikers organized pickets. A group of 300 men gathered in a narrow street blocking the main entrance to the tin mill and refused admission to employees who wanted to work. These tactics were continued until by Wednesday night operations were so crippled that the entire plant was shut down. Long became the leader of the strikers and Ellison of the pickets. The pickets congregated in large groups in the streets and at the mill entrances. They turned back cars of workmen seeking to go to work. They refused every one admittance to the mill. They carried clubs and threw stones and hooted and jeered men trying to go to work, calling them scabs and other vile names. They lifted automobiles off their wheels and turned them around; pushed back cars trying to enter the mill; threatened men who wanted to work; stoned cars hauling workmen to the mill; and sent groups of men called "Good-Will" committees to the homes of workmen to threaten them and their families with personal violence if they returned to work. The situation was so grave that the mayor of Steubenville issued a proclamation forbidding assemblies. In Weirton the strikers took advantage of the lack of police and took possession of the town and the mills. Thereupon the sheriff called upon the state police and a unit was dispatched to the scene.

Knowledge of the strike at Weirton was received at Clarksburg. The officers of the Clarksburg lodge called a meeting and a sympathetic strike was declared. Milstead, vice president of the lodge, when asked, "When this vote was taken to strike you had no knowledge of what the strike was about, did you?" frankly answered, "No, sir." Reese, an officer of the Steubenville lodge, testified that on the following day that lodge also declared a sympathetic strike. In response to an inquiry from Clarksburg, Reese telegraphed Guice, secretary of the Clarksburg lodge, the purpose of the strike was "Want recognition." Most of the employees at Weirton did not know what the strike was about. There had been no dispute between the company and the men. No vote was taken by the employees as to whether or no they should strike. Before the strike, no grievance of any kind was brought to any manager or officer of the company. On Wednesday, September 27, Long with officers of other lodges went to defendant's office and met the general superintendent and other officials. According to Long's testimony, the general superintendent "asked what the purpose of our visit was there." In reply, Long testified: "We told him the purpose of our visit was to ask him to recognize the Amalgamated Association sub-lodges in Weirton as the bargaining agency for the employees of the Weirton Steel Company * * *," and the general superintendent replied that "during the absence of Mr. Williams and Mr. Weir, it was not within their power and right to grant us recognition. * * *" No grievance of any sort was mentioned or even suggested at the meeting. Thereupon Long and his associates left the office.

About two weeks before Long's visit, Williams, president of defendant, had sailed for Europe to recover from a nervous break-

down. On the day following the visit of Long, Weir interviewed a large number of officials and employees at the office of the company in an effort to learn about the strike. The following day, September 29, he reviewed the situation in detail in a letter mailed to all the employees of defendant, the text of which appears in note 3.

NOTE 3.

Weirton Steel Company,
Weirton, West Va.
September 29, 1933.

To the Employees of The Weirton Steel Company:

In the absence of Mr. Williams, President of the Weirton Steel Company, I address this letter to you to give you a statement of the position of the Weirton Steel Company with respect to the recent labor disturbances at its plants.

The Weirton Steel Company signed the Steel Code approved by President Roosevelt and complied under the provisions of the National Industrial Recovery Act (usually called NRA) and is operating in accordance with that Code. The provisions of Article IV, Section 1 of the Code are:

(1) That employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection;

(2) That no employee and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing.

The Weirton Steel Company is operating according to the hours, rates of pay and conditions of employment prescribed by the President and some of them are more favorable to the employees than those of some of our competitors and none of them are less favorable.

We have never employed or discharged a man because of his organization connections and *our Company will never make it a requirement of any employee that he belong to any organization or that he does not belong to any organization.* We believe that it is better for the Company and the employees that the latter have their own organization within the Company but we have never made that a requirement of employment with us and do not intend to do so. *No employee will be discharged because of his failure to join any organization.*

In accordance with the privilege granted to employees under the NRA, the men working for us elected by secret ballot committees to represent them for collective dealing with the Company. The nominations for the committees were made secretly by the employees. Three times the number to be elected were placed on the ballot as a result of nominations made by the men and from this number committees were chosen by secret ballot. An average of over 85 per cent of all employees participated in the selection of these committees, and in the mill where this strike started over 90 per cent of the men made the selection of the committee. The committees were recognized by the Company and have dealt with the Company in 181 different matters that have come up since their organization, pertaining to wages, hours, and working conditions. There has been no matter brought to the attention of the Company by the committees which has not received prompt attention and all such matters have been adjusted satisfactorily to both parties.

On Sunday, September 24, 1933, without any warning to the Company, or without any notice or demand upon the Company of any kind, a number of men quit working in the Tin Plate Cold Rolled Department and others joined them in the walk-out later. The result of it was that certain parts of the mill were so completely tied up that it was necessary to close all the mills down and they are not now operating except for emergency work. A day or so later a group of men, purporting to be a committee of the strikers, asked us to negotiate with them as representatives of the employees, instead of the duly elected committees. Our duty under the NRA is clear. We must recognize the committees which have been selected and cannot be expected to negotiate with any other committee which happens to present itself. Under the NRA, our employees are free to select committees of their own choosing, whether made up of employees or not, but once the committees have been selected, we must recognize those committees. If the Company begins the practice of negotiating with any committee that presents itself, it will not be complying with the provisions of the Code which it has signed and its covenants with the President, and it is apparent that great confusion might result if several committees present themselves to negotiate with us.

It has always been our policy, however, to hear any committee of our own employees, and we will continue that policy.

Within a few days after this letter Weir interviewed several hundred employees at the office seeking to obtain first hand information of the cause of the strike. They came in a steady stream. In this throng Long appeared with a delegation of 16 or 17 Amalgamated Lodge members, together with Edward W. Miller, a vice president from the International office of the Amalgamated. Long was informed that Weir would receive the delegation but not Miller. Weir gives his own explanation of the reason for excluding Miller on this occasion. He testified:

"XQ. I want to go back for a moment, Mr. Weir, to the occasion when Mr. Long and other employees came to your office and requested an audience with you, at which time a Mr. Miller who has been referred to here I think as an official of the Amalgamated Association was present. You have that in mind, do you? A. Oh, yes.

"XQ. That occasion? A. Yes.

"XQ. Now, at least, you stated that during that entire day you were busy, meeting delegations and employees; that is the delegation came in, you made inquiry of them as to what their grievances were and what the strike was about, is that right? A. Yes.

"XQ. And you said that you were unable to ascertain what it was all about from anybody that you consulted with. Were you really very anxious to get that information? A. I certainly was.

"XQ. Then why did you not let Billy Long and Miller or anybody else come in that would be able to give you that information? A. I would be very glad to have had Billy Long and his associates that were em-ployed. I did not know Mr. Miller and I never heard of him.

"XQ. You knew that he was there in the capacity of an adviser, did you not? A. No, I did not know anything about him. I was trying to develop from our employees the basis for the strike.

"XQ. Did you not take the pains to ascertain who this man Miller was, and to find out whether you had any good objection to his being present at that meeting? A. I certainly had objection to anybody being present at those meetings except employees, and they are the only ones that could give me information as to the cause of the strike and the reason of its continuation."

Weir was then concerned solely with the cause of the strike. Large numbers of employees who were interviewed demanded an opportunity to return to work stating that they were being kept from work by a small group of employees. Practically all of them declared that they had no knowledge of the cause of the strike, did not approve it, and desired to resume work. The purpose of the Amalgamated delegation with Miller doubtless was to repeat the demand for recognition. To the employees' request for work and to the demand of the Amalgamated delegation for recognition, a formal answer was made by the defendant through Weir on the following day. In a letter to all the employees he stated:

"October 3, 1933.
"To the Employees of the Weirton Steel Company:
"After conferences with committees of our employees, we are convinced that the strike in our mills was instigated and is being maintained by only a small percentage

Any complaint or grievance may be presented to us by any individual or group of employees but all negotiations or collective bargaining must be with the committees selected. Any other procedure on our part would be a violation of our covenants under the Code.

We regret that the action of a small number of our employees has made it impossible for the others to continue working. We realize that the large majority of our employees would like to continue working without interference by the others. We have worked diligently during the depression to keep our men employed and to distribute the work fairly among them and we know that the large majority of our employees appreciate our efforts and are entirely satisfied with wages and working conditions in our plants. We have receiv-ed no complaints of any kind in relation to any of these matters. We are observing every provision of the NRA and it is unfortunate that a small group of employees should deprive thousands of men from working and thus defeat the very purpose the President of the United States had in mind in signing the Steel Code. We believe, however, that our loyal employees will recognize the unfairness of the position taken by the instigators of the present strike. We believe the large majority of our employees are anxious to comply with the codes and regulations issued by President Roosevelt and will heartily support us in our adherence to our obligations under the Code and repudiate the efforts of the instigators of this strike.

Weirton Steel Company,
E. T. Weir.

of our employees, and that the vast majority of them wish to return to work.

"The Weirton Steel Company has made no change in its policy—it will make no contract with the Amalgamated Association of Iron, Steel and Tin Workers, and there is no such requirement in the Steel Code, the NRA or the President's Recovery Program.

"We are co-operating in every way with the President's Program for reemployment, and fulfilling our obligations under the NRA and Steel Code, and we believe it our duty to open our mills and operate them with our own employees. You are not required to belong to any union.

"Notices will be posted of the time of returning to work.

"Weirton Steel Company,
"E. T. Weir."

Defendant's statement that "it will make no contract with the Amalgamated Association" provoked Long into sending a telegram to Senator Wagner: "Strike situation in Weirton becoming serious violence threatened E. T. Weir refuses conference with duly elected representatives. Request immediate assistance from your office. Wire reply Western Union. Wm. J. Long Chairman."

This telegram was supplemented by another of like tenor to Senator Wagner from the officers of the Clarksburg lodge. A week later, October 9, defendant posted notices advising employees that all departments would open on Tuesday morning, October 10.

October 10 the mills were opened. October 11 the chairman of the National Labor Board telegraphed the defendant: "In the matter of the strike at Weirton Steel Company National Labor Board recommends that strike be called off strikers be taken back without discrimination and all matters in dispute be submitted to Board for decision. * * *"

Weir replied on the same day: "* * * The strike leaders started the strike without having made any demands upon the company or without any notice to us and we can not consider any reference or arbitration until the men return to work stop The mills are operating now nearly five thousand men being at work all regular employees stop We will take back all of our former employees if they report to work promptly."

October 14, the chairman of the National Labor Board again telegraphed to Weir:

"National Labor Board pursuant to authority vested in it by the President has assumed jurisdiction over the strike at Weirton Steel Company, Weirton, West Virginia. Hearing will be held Monday October sixteenth two P. M., room seven ought six four Commerce Building Washington Board requests company send authorized representative would appreciate your coming personally."

To which Weir responded: "Replying to your wire of this date advising that the National Labor Board will hold a hearing on Monday regarding the Weirton strike comma our position is as stated in our former wire that there is nothing now properly before the National Labor Board for decision relating to our strike stop However in a desire to cooperate in the President's Recovery Program I will appear before the Board Monday and make a statement of our position in the matter without submitting it to arbitration."

It is appropriate to observe that when the National Labor Board purported to assume jurisdiction over the strike at defendant's plants it had not been created by Act of Congress or even by formal executive order. August 5, 1933, the President in naming the members of the board orally stated that it was to "pass primarily on any case of hardship or dispute that may arise from interpretation or application of the President's Re-Employment Agreement." The steel code had not then been approved. The board had no authority to assume jurisdiction over disputes arising under that code. On October 16 Weir and certain of the strikers headed by Long appeared before the labor board. None of the 49 representatives elected by the employees in the June election were invited to attend this hearing before the labor board and none were present. Long was heard at considerable length. In summing up his side Long said: "What we are after today is nothing more than what the law provides. We are allowed, according to Section 7, to choose our own representation. We chose this organization, the Amalgamated, for our representation. We have been denied the right to have them represent us in grievances. All we are asking is the right to have these men from the Amalgamated represent us in our grievances. We are not going into wages or hours or grievances; all we want is the right to have them represent us. Union recognition is the main issue."

Weir stated the company's position: "In June, 1933, our employees adopted a plan

of organization for collective bargaining and elected representatives to deal with the company in all matters of collective bargaining. Committees were selected from the various mills, in all totaling about fifty men. * * * One hundred eighty-one different matters have come up since the organization of these committees pertaining to wages, hours, and working conditions, and they have all received prompt attention and have been either adjusted satisfactorily to both parties or are still pending. When Mr. Long made his request that we negotiate with the committee which he claimed to represent, he was advised that all collective bargaining for our employees would have to be conducted by the committees which our employees had chosen. * * * To summarize, our position is this: We can not submit to arbitration the settled policy of the Company to maintain an open shop and not to contract with the Amalgamated Association of Iron, Steel and Tin Workers."

The hearing before the labor board lasted three hours. The only part of the Bethlehem plan criticized or objected to was the provision limiting the election of representatives to employees of the defendant. Weir agreed to recommend to the employees' representatives an amendment in this respect. During the course of the hearing there was no suggestion that a written memorandum was contemplated. After the hearing formally closed, however, a clerk of the labor board produced a writing which purported to embody the result of the conference. Before the memorandum was signed, Weir asked Senator Wagner the meaning of the words "procedure and method of election" in the memorandum and was assured that it did not contemplate any substantial change in the form of election provided for in the Bethlehem plan. The following memorandum was then signed:

"It is agreed:

"1. That the strike now pending in the Weirton Steel Company be called off immediately.

"2. The striking employees are to be permitted to return to work without discrimination, prejudice, or physical examination.

"3. An election will be held during the second week of December *under the supervision of the National Labor Board, the procedure and method of election to be prescribed by the Board*. (Italics supplied.)

"4. The employees shall be permitted, as guaranteed by the provisions of section 7 (a) of the National Recovery Act, to select representatives of their own choosing, and the employers agree to bargain collectively with the representatives so elected.

"5. In the event that any dispute arises out of this agreement, it is agreed that the same shall be submitted to the National Labor Board for decision.

"[Signed] E. T. Weir,
    "Representing Weirton Steel Company
"[Signed] Wm. J. Long,
    "Representing striking employees
"[Signed] Robert F. Wagner,
    "Chairman of National Labor Board."

This memorandum contains a direction for a *government supervised* labor election. This revolutionary suggestion was obviously devised as a substitute for the strike. It was bound to provoke resentment and to awaken unhappy memories.

The net result of the Washington conference of October 16 was that no material change in the Bethlehem plan or in the December elections should be made except that representatives were not required to be selected from among the employees of the company and that the National Labor Board should supervise the December elections.

October 19, three days after the Washington meeting, the defendant caused the following notice to be posted by the managers of the plants:

### "Notice

"During the recent shutdown, on account of inability to make deliveries, we have lost a considerable amount of business which has gone to competitors. This will be reflected in our operations during the winter, unless we can regain the business. To regain the business it is necessary that we have the cooperation of all of our employees to maintain deliveries and keep the standard of quality at the highest point.

"The strike is over and it is to everyone's interest to cooperate to the fullest extent with the management, so as to give the maximum amount of employment this winter. We agreed to take back all men without any discrimination. If any employee feels that he is being discriminated against, his case will immediately be looked into by the undersigned if he appears personally at my office.

    "Weirton Steel Company
    "Steel Works Department
        "Manager."

Although on October 16, 1933 the National Labor Board had no legal standing or authority and the written memorandum of that date had no binding effect, the terms of the writing respecting the strike were fully observed. Defendant took back all former employees including the leaders of the strike with the express assurance from the president of defendant that there would be no discrimination in such employment. The suggestion of Green, approved by Weir, at the hearing before the labor board that the choice of representatives should not be restricted to employees of the defendant as provided in the Bethlehem plan was carried out. Weir promptly made a recommendation to the rules committee of the representatives and the plan was unanimously amended November 9 in accordance with the suggestion.

The strike was a failure. The object of the strike was union recognition. It was not accorded. Defendant adhered to its declared policy of not making a closed shop contract with the Amalgamated Association. The proof establishes that "recognition" in this case and in the trade generally meant such a contract.

### December Elections.

The strike having failed, labor had recourse to government to aid in securing "recognition" through a supervised election. The success of this resort on the part of labor, of course, depended upon the outcome of the election.

There was sufficient ambiguity in the memorandum of October 16 to afford two diverse views of its meaning. Construing the memorandum with the oral statements at the hearing before the labor board, Weir understood that the rules committee of the employees would conduct the December elections under its own rules and that the government would supervise the regularity and fairness of those elections. On the other hand, Long and his committee interpreted the memorandum to mean that the government through its agents would conduct an election for the purpose of determining whether the Amalgamated Association or 49 representatives should act as the bargaining agent of the workmen.

Weir returned to Weirton and distributed copies of the memorandum to the management and to all the employees. On November 9 a meeting of the rules committee of the employees' representatives was held. From the minutes of that meeting it appear-

ed that arrangements for the December elections were embodied in a series of resolutions as follows:

"Motion made by J. Larkin and seconded by J. Madden that Mr. Williams be requested to ask the National Labor Board to have the election of representatives, which is to take place December 11th, be conducted as nearly as possible along the same lines as the last election.

"Motion made by J. Madden and seconded by J. Weaver that Article 4, Section 16, be suspended during such period as the National Industrial Recovery Act is in force. Motion carried.

"Motion made by L. Truvel and seconded by J. Weaver that 5 men be appointed by Rules Committee to serve as clerks and judges of election at each precinct. Motion carried.

"Motion made by J. Weaver and seconded by J. Larkin that name or check number *only* shall be *written* on ballot for nomination and election. Any other method of marking ballots shall render ballot void. Motion carried.

"Motion made by J. Madden and seconded by G. Ferguson that no representative shall be eligible to serve on election board. Motion carried.

"Motion made by J. Larkin and seconded by J. Madden that no person nominated shall be eligible to serve on election board. Motion carried.

"Motion made by J. Weaver and seconded by J. Madden that Representatives elected shall serve for a period of one year effective January 1, 1934. Motion carried.

"Motion made by J. Larkin and seconded by L. Truvel that no electioneering be allowed within 50 feet of the polls.

"Motion made by J. Madden and seconded by J. Weaver that polls be open from 1:00 AM to 5:00 AM, 9:00 AM to 1:00 PM, 5:00 PM to 9:00 PM carried.

"Motion made by J. Weaver and seconded by J. Madden that a list of eligible voters be posted before nominations and that names be posted under the department for which they work. Carried.

"Motion made by W. Conn and seconded by E. Yocum that the above rules be accepted by the General Representatives as submitted. Motion carried.

"Motion made by J. Larkin and seconded by J. Young that information concerning the eligibility of office or clerical force participating in nomination and election of repre-

sentatives be asked for from Labor Board. Also a ruling as to whether a foreman is to be considered as an employee eligible to vote. Motion carried."

The committee on rules having prepared rules for the December elections wrote to the labor board November 14, 1933, as follows:

"Senator Robert F. Wagner, Chairman,
"National Labor Board,
"Department of Commerce Building,
"Washington, D. C.

"Dear Senator Wagner: The undersigned constitute the Rules Committee of the Employees Association of the Weirton Steel Company and we are responsible for the conduct of the annual election. We understand, of course, that the Company has agreed that the Labor Board shall supervise the coming election and we are glad to have such supervision but we will appreciate it if you will advise us promptly when you select the persons who are to conduct this election for you and instruct such persons to communicate with us. We feel that we represent the large majority of the employees in Weirton and as we have given a good deal of thought to the proper method of conducting an election there we think we can give your representatives some valuable pointers on desirable procedure for the coming election.

"Yours very truly,
"Chairman,  [Signed]  John Larkin
             "[Signed]  J. F. Madden
             "[Signed]  L. W. Truver
             "[Signed]  George Ferguson
             "[Signed]  John Weaver
             "[Signed]  J. J. Young
             "[Signed]  B. A. Fenske."

Preparation for government supervision started November 27. The labor board sent James F. Dewey, an agent of the Department of Labor, to Weirton "to arrange for the holding of an election," without giving him specific instructions. He remained there two days. He first conferred with the Amalgamated committee headed by Long. He gathered the committee's ideas of how the election should be held. Then he saw the president of defendant. Dewey told Williams the election was to be conducted by the government under rules and regulations of the labor board and through its own agents and be held outside the plants. Although dissenting from these suggestions, Williams said it was not his affair and told Dewey he "would have to work this out with the Committee of the employees." Dewey had no further conference with the company or any officer of the company until the day of the election. As directed, Dewey conferred with Larkin, chairman of the rules committee of the employees and also of the 49 representatives. Thereafter all of Dewey's negotiations were with Larkin and Long and their respective committees.

Dewey was not able to bring the two groups to any agreement. He testified: "The Amalgamated Committee wanted the straight ballot, the right to vote for an organization, which they contended under the law they had a right to so vote. The employees, the representative committee, would not agree to that kind of a ballot, insisting that under their plan, they wanted to vote for individuals, in that election." Dewey reported to the National Labor Board that the groups were unable to agree on the holding of an election.

The Amalgamated Association intended to place a ticket in the field and was holding meetings almost every day. It had rented all the halls in Weirton. As the campaign proceeded, the Amalgamated Association drew up ballots containing a list of candidates and submitted them to the National Labor Board. As the election approached, the Amalgamated Association issued a warning to the employees not to vote "until Government Officials take charge." This warning was embodied in the following notice posted throughout the mills of the defendant:

"Workers Do Not Be Misled.

"Do not vote at election the company will hold Monday, December 11th. The United States National Labor Board will hold the only election to decide who shall represent you. If you vote Monday you will vote for the Company Union. Do not vote until Government Officials take charge. [Note. The above paragraph is here repeated in Slavic, Polish, Serbian, Italian and Greek.]
"Weir-Cove Lodge, No. 30, W. Va.—Wm. Long, President.
"Valley Lodge, No. 31, W. Va.—Mel Moore, President.
"Blue Eagle Lodge, No. 32, W. Va.—Thomas Murray, President.
"New Deal Lodge, No. 33, W. Va.—Charles Greenwood, President.
"NRA Lodge, No. 35, W. Va.—Chas. Anderson, President.
"Progressive Lodge, No. 38, W. Va.—Henry Fisher, President.

"Good Will Lodge, No. 39, W. Va.—Jacob Entinger, President.

"Steubenville Lodge, No. 150, Ohio—George Dunn, President.

"Amalgamated Association of Iron, Steel and Tin Workers of North America." ·

Having heard nothing from Dewey since his visit to Weirton and having heard nothing from the labor board, the rules committee decided that further delay would result in confusion and disorder and on December 5, six days before the primary election, it posted its rules for the election. On the same day the rules committee wrote to Dewey: "Inasmuch as we have received no advice from you since supplying you with a copy of our rules of election, at a meeting of our Rules Committee today it was decided, in view of the limited time before balloting takes place for nominations, to proceed with our plans. We are therefore attaching a copy of the notice being posted on all bulletin boards today, giving the rules of election as handed you."

On receipt of this letter December 6 Dewey telephoned Millsop, an executive of the company, asking him to have the members of the rules committee appear in Washington before the labor board on December 7. On December 7 when the rules committee came before the labor board, Long and his committee were also present. As was appropriate, defendant was not notified and in fact was in no way represented at the hearing. A heated discussion ensued during which the strongly opposed views of the two groups were expressed. During the discussion Senator Wagner produced from a drawer in his desk a set of rules for the elections to begin in three days. These rules provided among other things for nominations by petition as well as by primary election. Long's committee accepted the Wagner rules. The rules committee strenuously objected to this provision and told the labor board the only thing they could do was to go back to Weirton and submit the matter to the 49 representatives. No suggestion was made by any one at this hearing that the number of representatives to be elected should be doubled. The next day, December 8, the 49 representatives considered the rules submitted by Senator Wagner and telegraphed the result of their action:

"Hon. Robert F. Wagner, National Labor Board, Washington, D. C.

"At conference of Employees Representatives today it was voted unanimously to reject rules of election submitted by Labor Board and carry on under our own rules of election as submitted to you and we will appreciate supervision by National Labor Board.

"Rules Committee of Employees' Representatives of Weirton Steel Company.

"J. Larkin, Chairman.

"J. Young, Secretary."

After this telegram, it was apparent that government supervision of an election as contemplated by Long was definitely rejected by the 49 representatives and the possibility of "recognition" through an election under such supervision was completely dispelled. Thereupon notice was given to Amalgamated members not to vote at the coming election. This is plainly stated in the testimony of Long.

In the afternoon of the next day, Saturday, December 9, the rules committee received another set of rules that had been forwarded by the labor board to the defendant with a request to post them in the mills. These rules provided for the election of 98 representatives instead of 49. This radical change in the Bethlehem plan had never been suggested before. How it came about is a mystery. Teagle and Berry, two members of the labor board, testified that they had no knowledge of the adoption of this set of rules and that they never knew until months afterwards of any proposed change in the number of representatives.

For some weeks, there had been active campaigning among the employees for the election of representatives. Slates had been formed and campaign literature distributed. All upon the assumption that 49 representatives were to be chosen. Great consternation and confusion would have resulted if a set of rules providing for doubling the number of representatives and nominations by petition had been posted within 30 hours before starting the elections. Nomination by petition would have caused infinite confusion and had not prevailed at any plants having employee representation plans.

On Monday, December 11, Dewey, Leiserson, and Miller, three representatives of the labor board, called upon Weir in Pittsburgh with another set of rules restoring the number of representatives to 49. The primary election had begun at midnight 12:01 a. m. Monday, December 11, and the second shift was already about over. It was too late to object to these rules, much less to comply with them. Here were representatives of the labor board in Pittsburgh with another set of rules miles away from the

places of election and hours after voting at the primary had begun. Rejection of the rules of the labor board was not only justified but necessary under the circumstances.

In this connection it should be borne in mind that the labor board had no authority to conduct an election. Its position was that of a mere volunteer acting as a group of individuals and not as a lawfully constituted authority. The nomination election on Monday and the general election on the following Friday were carried out under the rules of the rules committee.

In the general election 11,443 employees were listed as eligible voters. Of this number, approximately 9,500 were working in the mills while the election was being held. The balance were absent from the mills because of adjustments into periods of employment made necessary to secure continued operation and to comply with the requirements of the Steel Code. The election boards certified that 9,336 employees went into the election booths and were given ballots containing the names of candidates nominated at the primary. 6,813 valid ballots were counted and certified by the election boards. About 1,500 ballots were rejected. The defendant estimates that perhaps 600 of these ballots were void through mistake or otherwise technically defective. The government audit of the rejected ballots only differs from the result of the election boards by 187. This difference may easily be due to the interpretation given irregular ballots. It should be remembered that many of the voters were foreigners without knowledge of English and not able to properly mark a ballot. It should also be remembered that many Amalgamated employees deliberately marked their ballots for the purpose of having them rejected pursuant to instructions of Long and his associates. The result of this election is conclusive evidence that an overwhelming majority of the employees approved of the employee representation plan then in effect.

The government rests its case largely upon alleged "interference, restraint or coercion" affecting the December elections. The Amalgamated Association intended to have candidates in the field and was holding meetings almost daily. The president of the company made a number of speeches to employees before the elections. His remarks were principally devoted to answering charges made by speakers in the meetings held on behalf of the Amalgamated Asso-

ciation. That association had been holding mass meetings at prominent places in Weirton, sometimes addressed by outside speakers. These speeches were broadcast on the street. It was charged that the company exploited its labor, paid lower wages than other companies, and declared excessive dividends to stockholders. Officers of the company were characterized as "skunks" and "robbers." At the same time complaints were received from customers of the defective quality of the products shipped shortly before and after the strike. In view of these facts and in response to several invitations of employees, Williams made a number of speeches to the men. He explained that they were free to elect William Green, Mike Tighe, or any one else as their representative. He offered to pay $25,000 to any charity in the Ohio Valley if any person could show him where defendant had failed to pay as high wages as the Amalgamated scale. To statements made in Amalgamated meetings that if it won the election the company would be forced to recognize it and no one would be employed except Amalgamated men, he replied that the company would never make a closed shop contract with the Amalgamated Association. He never suggested even remotely the election of any candidate for representative. He pointed out that what injures the company injures the men and that much business had been lost as a result of the strike. He answered the inquiries of the men as to the prospect of increased operations. He ended every speech with a statement that the men were entitled to do as they pleased in the election and that the company would deal with the representatives chosen. He urged the men to settle their differences through the election and get down to work to improve production. A frank discussion of the subjects dealt with by Williams was due the employees. He went no further.

During the 28 years of its existence, defendant had built up a very substantial business. Part of this business was with customers who purchased from defendant their entire supply of raw material. When the strike occurred in September, defendant sent letters to its customers explaining its inability to make deliveries according to schedule. Twelve furnaces had been in operation before the strike and only 5 or 6 furnaces afterwards. Certain customers had to cancel their orders and obtain supplies elsewhere. In some cases there had been a partial suspension of operations in

customer's plants. Many letters from customers referred to defects in defendant's products during the period of the labor disturbance. In accordance with usual practice defendant showed these letters, including a letter from the Liberty Can & Sign Company, to the foremen and workmen in the departments involved. No letter was shown except to employees concerned in the manufacture of the defective product. Plaintiff charges that defendant gave entertainments at a country club to induce employees to vote at the coming elections. This club was merely the basement of an unfinished building. On several occasions candidates for representative in electioneering held meetings in this building. The parties were financed by the candidates through the sale of tickets. Defendant had no interest in and took no part in any of these entertainments.

Plaintiff produced 17 witnesses to sustain the allegations that the December elections were unfairly conducted. These charges range from one instance of physical injury to the wrist of a foreign-born workman who backed into a pile of iron apprehending that an approaching foreman would urge him to vote when he did not desire to vote, to an instance of "booing" an Amalgamated member by a fellow workman. Defendant produced 56 witnesses who were present in the mills during the elections all of whom testified that they neither saw nor heard any threats, coercion, or intimidation. Two of these witnesses were agents of the Department of Justice assigned by the department to visit defendant's plants on the day of the general election and to ascertain and report whether any acts of intimidation or coercion were committed by the defendant. One agent when asked, "Will you state whether or not you observed any intimidation, coercion or disorder in that voting?" answered "I did not." Allegations of intimidation or coercion at the December elections are not sustained by any proof of acts or words of any member of the management. Defendant's instructions to every member of the management including foremen was to afford to all employees an opportunity to vote, but otherwise to observe a strict policy of "hands off." The preponderance of evidence shows that these instructions were fully obeyed save in a few instances where overzealous foremen attempted to persuade certain employees by argument that the Bethlehem plan afforded greater advantages to the workmen than the Amalgamated Association.

Witnesses who testified that various foremen had threatened to discharge them if they failed to vote in the December elections at the same time testified that they had not voted and were still in the employ of defendant. There was some testimony to the effect that the places for paying wages were changed on the day of the primary election for the purpose of influencing men to vote. This is completely explained by defendant's testimony that the changes were made at the request of the rules committee of the employees for the convenience of the men who were not working on that day, but only came to the mill for their pay. The changes avoided the inconvenience of going to one end of the mill to be paid and to the other end of the mill to vote. The changes were known some days before the election and no objection was made by any one.

Demands For Recognition After December Elections.

Having failed to obtain recognition either by the strike or by a government supervised election, the Amalgamated Association persisted in its efforts to obtain recognition from defendant. In May, 1934, the 7 Amalgamated lodges executed formal demands for recognition addressed to defendant using printed forms provided by the general offices of the Amalgamated Association. One of such demands was made by Weir Cove Lodge No. 30 in the following form:

"Weirton, W. Va. Date May 21, 1934.

"To the Officers or Representatives of The Weirton Steel Co. Weirton, W. Va.
Name of Company or Corporation
We, your employees, have affiliated ourselves with the International Amalgamated Association of Iron, Steel and Tin Workers of North America, and have instituted a lodge of the aforesaid Association under the name of the            Weir Cove            Lodge

No. 30        State        W. Va.
for the express purpose of bargaining collectively on all matters pertaining to wages, working conditions and such other matters that come under the laws, rules and regulations of the aforesaid International Amalgamated Association of Iron, Steel and Tin Workers;

"We respectfully ask that you give most earnest and favorable consideration to our request for recognition of the above named

lodge, and would appreciate an answer in writing on or before June, 10th, 1934.

> "Committee.
>
> "[Signed]   Wm. J. Long
>
> "Weir Cove Lodge No. 30 State of W. Va.
>
> "[Signed]   J. C. Marks
> "[Signed]   Geo. N. Thomas
> "[Signed]   Joe Pietranton
> "[Signed]   C. W. Hayes
> "[Signed]   Roy James."

Long, with the presidents of the lodges, visited the executive vice president of defendant at his office and read the above demand. Thereupon the vice president said: "Bill, do I understand from the word 'recognition' in this demand that what you mean is for us to sign a contract with the Amalgamated and operate a closed shop?" Long replied, "That is correct." Months afterwards Long flatly denied this statement. Being advised of their coming, the vice president had a stenographer present who took down the entire conversation. She testified that she truly recorded the conversation in shorthand and transcribed it and having transcribed it sent copies to Mel Moore, president of Valley Lodge No. 31. Moore admitted the receipt of six copies of the transcript and that he delivered one to each and every member of the visiting committees except Reese. The above conversation with the vice president appeared in each copy of the transcript including the one handed to Long by Moore. Neither Long nor any member of the committee ever questioned the accuracy of the transcript until months later. On June 5 the defendant sent a letter by registered mail to the president of each of the seven lodges in reply to the demands received. In the reply defendant called attention to the fact that the demands were for a closed shop and that such demands would never be granted.

The record is replete with evidence of the meaning of "recognition." At least 18 witnesses testified that recognition of the Amalgamated Association has always been understood to mean a closed shop. A "closed shop" agreement with any union involves an undertaking by the employer to employ only members of the union. It follows that workmen who were not members of the union were excluded from employment. With the universal meaning of "recognition," it was inevitable that defendant and its officers shared that understanding.

### The Weirton Plan.

The Bethlehem plan of employee representation effective in June, 1933, at defendant's plants was so amended by the employees that a new plan of employee organization was evolved and is now effective. The Bethlehem plan with the Weirton plan superimposed thereon appears at length in note 4. The amendments are shown as new

---

NOTE 4.

Plan of
Employee Representation.
In Plants of
Weirton Steel Company.

In order to give the employees of the Weirton Steel Company, a voice in regard to the conditions under which they labor, and to provide more effective communication and means of contact between the Management and Employees on matters pertaining to industrial relations, the following plan of Employee Representation has been adopted.

#### I. Representation.

1. Representation shall range from one Representative for each 100 employees in the small plants to one Representative for each 300 employees in the larger plants.

Minimum number of Representatives 5.
Maximum number of Representatives 15.
Such adjustments as may be necessary to meet special cases shall be made.

2. For the purpose of applying the unit of representation, the plants should be subdivided according to departments and natural sub-divisions. Wherever it is necessary to group a number of small departments in order to complete a unit of representation, regard shall be had to logical groupings and location.

3. Adjustments in units of representation shall be made in accordance with the recommendations of the ~~Joint~~ *General* Committee on Rules.

#### II. Terms of Representatives.

1. Representatives shall be elected for a term of one year, and shall be eligible for re-election.

2. A Representative may be recalled upon the approval by the *General* Committee on Rules of a petition signed by two-thirds of the voters in his department.

3. A Representative shall be deemed to have vacated office upon termination of his employment with the Company; permanent transfer from one voting unit to another or upon his appointment to such a regular position as would bring him within the meaning of Paragraph 3, Section III, entitled "Qualifications of Representatives and Voters."

matter printed in italics and by deletions indicated by lining out. This new plan of employee organization I have called the Weirton plan. The steps taken by the employees whereby the new plan was evolved should be detailed. The significant changes

---

4. Vacancies in the office of Representative may be filled in the discretion of the *General* Committee on Rules, by special elections conducted in the same manner as the general elections.

### III. Qualifications of Representatives and Voters.

1. Any employee who has been on the Company's pay rolls for a period of one year prior to nominations, who is twenty-one years of age and over, and who is an American citizen shall be qualified for nomination and election as a Representative.

2. All employees who are enrolled on the Company's pay rolls and who have served for a period of at least sixty days prior to the date fixed for nominations, shall be entitled to vote.

3. Company officials and persons having the right to hire or discharge shall not be eligible as Representatives or qualified to vote for Representatives.

4. This plan shall in no way discriminate against any employee because of race, sex or creed, or abridge or conflict with his or her right to belong or not to belong to any lawful society, fraternity, union or other organization.

### IV. Nominations and Elections.

1. Nominations and elections shall be held annually.

2. Nominations shall be held on the second Monday and elections on the following Friday of *December* ~~the month selected~~. In the event of either of these days being a holiday, the day immediately following shall be substituted.

3. The total number of Representatives shall be chosen at each annual election.

4. The nominations and elections shall be conducted by the employees themselves, in accordance with these rules and regulations.

5. Nominations and elections shall be by secret ballot, and so conducted as to avoid undue influence or interference with voters in any manner whatsoever, and to prevent any fraud in the casting or counting of ballots.

6. On the day of nominations, each duly qualified voter shall be furnished with a ballot stating the number of persons for whom he is entitled to vote, on which he shall write the name or check number of the persons in his Plant, or unit, whom he desires to nominate as Representatives.

7. A voter may place in nomination twice the number of Representatives to which his Department, or unit, is entitled.

8. If on any ballot, the same name is placed in nomination more than once, it shall be counted but once.

9. Should the number of persons nominated on any ballot exceed the permitted number as stated on the ballot, the ballot shall be void.

10. There shall be *two* ~~three~~ persons nominated for every person to be elected.

11. Those who have received the largest number of votes up to *two* ~~three~~ times the number of Representatives to be elected shall be declared nominated, and shall be candidates for election.

12. On the day of elections, each duly qualified voter shall be furnished by the Committee on Rules with a ballot on which the names of the candidates shall be printed in the order of number of votes received at nominations. The voter shall indicate his preference by placing a cross (X) opposite the names of the candidates of his choice.

13. Candidates to the number of Representatives to which a Department or unit is entitled may be voted for and this number shall be stated on the ballot. If this number is exceeded, the ballot shall be void.

14. Each voter shall deposit his own ballot in a box provided for the purpose by the Committee on Rules, and the ballots shall be counted under the direction and supervision of said Committee ~~and a representative of the Management.~~ The candidates receiving the highest number of votes shall be declared elected.

15. Candidates failing of election shall stand as alternates in the order of the number of votes received and become Representatives as need may arise through vacancies or increased forces.

16. *In the event of a tie,* ~~seniority in~~ *the Committee on Rules shall determine the choice by* ~~the Company's continuous employment~~ *some fair method.* ~~shall determine the choice.~~

17. In the event of a controversy arising concerning any nomination or election, it shall be referred to and decided by the *General* Committee on Rules.

18. The *General* Committee on Rules may make such provision as they may consider necessary for assisting any voter who may so request, in properly marking his ballot.

### V. Management's Representative.

1. The Company shall appoint a Management's Representative.

The Management's Representative shall

readily appear from an examination of the footnote. The Bethlehem plan is frequently called the "Joint Committee" plan, under which the management appoints representatives to joint committees and under which amend-

---

keep the Management in touch with the Representatives, and represent the Management in negotiations with the Representatives, their Officers and Committees. He shall respond promptly to any request from Representatives, and shall interview all of them, from time to time, with reference to matters of concern to employees.

2. The Management of the works and the direction of the working forces, including the right to hire, suspend, or discharge for proper cause, or transfer, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Management; and, except as expressly provided herein, these rights shall not be abridged by anything contained herein.

### VI. Committees.

*1. After each annual election, the Repre-* ~~1. After each annual election, the Repre-~~ *sentatives shall immediately meet for the* ~~sentatives shall immediately meet for the~~ *purpose of electing a Chairman and Sec-* ~~purpose of electing a Chairman, Secre-~~ *retary. There shall also be four (4) Gen-* ~~tary, a General Committee, and Commit-~~ *eral Committees elected, to be designated* ~~tee on Rules, and for selecting members~~ *as: Committee on Appeals, Committee on* ~~of such other Committees as are found~~ *Rules, Committee on Finance and Commit-* ~~necessary by the Committee on Rules for~~ *tee on Recreation and Housing. If found* ~~the consideration of the following sub-~~ *necessary by the General Committee on* ~~jects:~~
*Rules, Committees may be selected from the general body of Representatives for the consideration of the following:*

> Rules
> Ways and Means
> Safety and Prevention of Accidents
> Economy and Waste Prevention
> Wages, Piece Work, and Tonnage Rates
> Hours of Employment and Working Conditions
> Housing and Living Conditions
> Health and Works Sanitation
> Education and Publications
> Athletics and Recreation
> Continuity of Employment and Condition of Industry

*2. The General Committees (Appeals,* ~~2. The General Committee shall consider~~ *Rules, Finance, Recreation and Housing)* ~~all matters not falling within the scope of~~ *shall be composed of six members, one* ~~any other Committees herein provided for,~~ *member to be elected by each of the six*

~~and the Chairman and Secretary of the~~ *Divisions (Tin Plate, Steel Works, Sheet* ~~Representatives shall be members of the~~ *Mill, Strip Steel, Steubenville, and Clarks-* ~~General Committee. This Committee~~ *burg). Each General Committee shall* ~~when jointly composed shall act as a Com-~~ *elect a Chairman and Secretary and in no* ~~mittee on Appeals.~~ *case will a Representative be elected to serve on more than one of the General Committees.*

3. Each Committee *other than the General Committees,* shall be composed of *not less than* five members, and shall ~~elect~~ appoint its own Chairman and Secretary.

*4. No Representative shall be eligible to* ~~4. Vacancies on Committees shall be fill-~~ *hold more than one executive office outside* ~~ed at a regular meeting of the Representa-~~ *of his own unit. This shall be mandatory* ~~tives.~~ *in all instances.*

*5. Vacancies on Committees shall be fill-* ~~5. Joint Committees shall consist of the~~ *ed by election at a regular meeting of the* ~~Committees of the Employees' Representa-~~ *Representatives particularly affected.* ~~tives with the addition of the Company's Representatives named by the Management, who may equal but shall not exceed in number the Employees' Representatives.~~

6. The ~~Joint~~ Committees shall select their own officers and arrange their own procedure, subject to appeal, in case of controversy, to the *General* ~~Joint~~ Committee on Rules.

7. Wherever the word "Committee" is used throughout this instrument, it shall mean the special Committee of Employees' Representatives ~~unless a "Joint Committee" is specified.~~

### VII. Advisory Committee.

*The Chairmen of the six divisional Committees and the General Chairman and General Secretary of the General Representatives shall constitute an Advisory Committee. This Committee shall consider such matters not falling within the scope of any other Committees herein provided for.*

### ~~VII.~~ VIII. Committee Meetings.

1. Regular meetings of Committees shall be held *at least* once a month.
~~2. On alternate months, the Committees shall meet as Joint Committees.~~
~~3.~~ 2. Committees shall meet between the hours of *one* ~~three~~ and five in the afternoon, unless otherwise arranged for on joint approval of the Chairman of the Em-

ments to the plan require the concurrence of the management. Defendant never exercised its right to appoint management's representatives to the Joint Committee because the president of defendant declared the plan should be subject to the control of the work-

---

ployees' Representatives and the Management's Representatives.

~~4.~~ *3.* Special meetings of Committees ~~and of Joint Committees~~ may be held as occasion may require, on approval of the Chairman of the Employee's Representatives and the Management's Representative.

*4. For time necessarily occupied attend-* ~~5. For time necessarily lost, in actual~~ *ing meetings or acting in Representative* ~~attendance at regular meetings or at spe-~~ *capacity, Representatives shall receive* ~~cial meetings of conferences jointly ap-~~ *from the Company payment commensurate* ~~proved, Representatives shall receive from~~ *with their average earnings.* ~~the Company payment commensurate with their average earnings.~~

*5. Any employee called upon as a witness before any Employee Representative meeting shall be compensated by the company for time lost attending such meeting.*

*6. Any employee called as a witness shall request a voucher from the Chairman of the Committee before which he appeared, stating why he was called and the time occupied before said Committee, and this voucher shall be presented to the chief clerk of his unit for payment for time occupied. Compensation for any or all witnesses shall be at their regular rate of earning.*

~~6.~~ *7.* Representatives shall have the right to appear before and be heard by a Committee considering matters of concern to the employees of the Department or unit they represent.

~~7.~~ *8.* A Committee, when concerned with matters of special interest to any particular Department or class of employees, shall have the right of inviting into conference the Representatives of the Employees and of the Management likely to be specially interested in such matters.

~~8.~~ *9.* Any matter may be referred by the Management through the Management's Representative to any Committee ~~or Joint Committee~~ for consideration and report, and any matter may be presented by a Committee ~~or Joint Committee~~ to the Management through the Management's Representative.

~~9.~~ *10.* The General ~~Joint~~ Committee on Rules shall arrange a suitable place for meetings of the Representatives, and of the several General Committees. ~~and Joint Committee.~~

~~VIII.~~ *IX.* Annual Conference.

An annual conference between all of the Employees' Representatives and Repre-

sentatives of the Management shall be held at a time and place determined by the General ~~Joint~~ Committee on Rules, who shall be in charge of the procedure at such conference.

~~IX.~~ *X.* Procedure for Adjustments.

1. Any matter which in the opinion of any employee requires adjustment, and which such employee has been unable to adjust with the Foreman of the work on which he is engaged, may be taken up by such employee, either in person, or through any Representative of his Department in writing.

First—

With the Superintendent concerned.

Second—

With the Management's Representative.

Third—

With the Management, who shall endeavor to effect a settlement, or who may with the approval of all the parties refer the matter to *the* proper ~~Joint~~ Committee.

2. Unless a satisfactory disposition of any such matter has been effected within a reasonable time, any employee through his Representative, or the Management through the Management's Representative, may require such matter to be referred to the General ~~Joint~~ Committee on Appeals by a request in writing addressed to said Committee, specifying in detail the matter requiring adjustment and the reasons which warrant its consideration by said Committee.

The General ~~Joint~~ Committee on Appeals shall consider any such matter with reasonable promptness, at a regular or special meeting, and may adopt such means as are necessary to ascertain the facts and effect a settlement.

3. If the General ~~Joint~~ Committee on Appeals shall fail to effect a settlement, the President of the Company shall be notified, and the matter may be referred, if the President and a majority of the Employees' Representatives on the General Appeals ~~Joint~~ Committee agree to such *to a Board of Arbitration; one* reference. ~~to an arbitrator or arbitrators,~~ *member of said Board to be selected by the* ~~to be determined at the time according to~~ *General Committee on Appeals, one member* ~~the nature of the controversy.~~ *ber by the Management, and these two members to select a third member. The findings of the Board of Arbitration shall be final and binding on all parties.*

4. *All Committees herein created may consider all matters arising hereunder, but*

men only. The only amendment suggested by the defendant was the amendment to permit the election of outsiders as well as employees to be representatives. (Article XIII.) This was a step to liberalize the plan and was made at the suggestion of Wil-

the Company Representatives, if any, on such Committees shall have no vote, the determination of all matters being vested solely in the elected Representatives and their successors duly chosen.

5. No controversy or complaint shall be considered by any Committee relating to a matter occurring prior to July 1, 1933, and no decision or adjustment of any current matter shall be retroactive beyond July 1, 1933.

~~X.~~ XI. Guaranteeing the Independence of Representatives.

It is understood and agreed that each Representative shall be free to discharge his duties in an independent manner, without fear that his individual relations with the Company may be affected in the least degree by any action taken by him in good faith in his representative capacity.

To insure to each Representative his right to such independent action, he shall have the right to take the question of an alleged personal discrimination against him, on account of his acts in his representative capacity, to any of the Superior Officers; to the General ~~Joint~~ Committee on Appeals, and to the President of the Company.

Having exercised this right in the consecutive order indicated and failing a satisfactory remedy within thirty days, a Representative shall have the further right to appeal to the State Department of Labor or the Secretary of Labor of the United States. The Company shall furnish the said State Department of Labor or the said Secretary with every facility for the determination of the facts, and the findings and recommendations of the said State Department of Labor or the said Secretary shall be final and binding.

~~XI.~~ XII. Amendments.

~~Any method of procedure hereunder may be amended at any time by two-thirds vote of the entire membership of the Joint Committee on Rules, or by concurrent majority vote of the Employees' Representatives and of the Representatives of the Management at an Annual Conference.~~

1. A proposal to change or amend these by-laws may be made at any time by any Divisional Committee of Representatives when a two-thirds majority vote of the Representatives in the unit is recorded in favor of such change or amendment.

2. The General Rules Committee may also propose changes or amendments by a favorable vote of two-thirds of the entire membership of the Committee.

3. In order to change or amend these by-laws, it will be necessary to have a majority vote of all the Divisions, each Division to be counted as a separate unit, with one vote, the vote of the unit to be determined by a two-thirds majority of the Representatives in each unit or Division.

4. These by-laws may also be amended by a two-thirds majority vote of all the elected Representatives at any meeting of the entire body of Representatives, provided each Representative has been notified in writing at least seven days prior to such meeting, giving substance of the amendment to be voted on.

~~XII. Right of Termination.~~

~~This plan shall be and remain in full force and effect during the term of the National Industrial Recovery Act and thereafter may be terminated by the Management or by a majority of the duly elected Employees' Representatives upon three months' notice.~~

### XIII. Modification Under NRA.

All provisions herein requiring Employees' Representatives to be in the employ of the Company are suspended during such period as the National Industrial Recovery Act, approved June 16, 1933, is in force.

### XIV. Wage Changes.

The Company having agreed to submit all questions of general increase or decrease of wages to the Representatives, any action approving such increase or decrease must have a majority of all elected Representatives.

### Rules.

Section I. Procedure of Meetings.

1. Roll Call (Individuals or by Divisions).

2. Reading and Approval of Minutes of Previous Meeting.

3. Secretary-Treasurer's Report.

4. Advisory Committee's Report.

5. Report of General Committees:
   a. Finance.
   b. Appeals.
   c. Rules.
   d. Recreation and Housing.

6. Unfinished Business.

7. New Business.

8. General Discussion.

9. Adjournment.

Section II. Procedure Governing Elections.

1. Five men shall be appointed by the General Rules Committee to serve as clerks and judges of election in each precinct.

liam Green, a member of the labor board. The Weirton plan is a type of the so-called "Employees' Committee" plan. The management only sit in to hear the demands of the representatives and to bargain concerning grievances. Very substantial

2. Name or check number only shall be written on ballots for nomination and election. Any other method of marking ballots shall render ballot void.

3. No Representative shall be eligible to serve on Election Board.

4. No person nominated shall be eligible to serve on Election Board.

5. Representatives elected shall serve for a period of one year, effective January 1st of each year.

6. No electioneering shall be allowed within fifty feet of polls.

7. Polls shall be open from 1:00 A. M. to 5:00 A. M.—9:00 A. M. to 1:00 P. M.— 5:00 P. M. to 9:00 P. M.

8. A list of eligible voters shall be posted before election in each precinct.

*Section III. Procedure for Calling Meeting of General Body of Representatives.*

In addition to the Annual Conference of all of the Employees' Representatives, Special Meetings may be called from time to time in order to transact such business as might require the action of the entire body of Representatives. Special meetings may be called as follows:

1. Any Representative may request his Divisional Committee to call for a meeting of the entire body of Representatives clearly stating the reasons for such request.

2. Upon the request of any Representative, the Divisional Committee, of which the Representative is a member, will consider the matter. If two-thirds of the members of the Divisional Committee vote favorably, the request will be referred to the General Rules Committee.

3. Upon receipt by the General Rules Committee of a proper request from any Divisional Committee to call a Special Meeting, the General Rules Committee shall submit this request in writing to all Divisional Committees, stating clearly the reasons for calling the meeting.

4. Each Divisional Committee shall vote upon the request as submitted by the General Rules Committee, reporting the vote to the General Rules Committee.

5. It will require a two-thirds majority vote of any Divisional Committee in order to consider that unit as voting in favor of calling a Special Meeting.

6. If a majority of the Divisions report a favorable vote, the General Rules Committee shall request the General Chairman of the entire body of Representatives to call a meeting and arrange to notify each Representative of the time and place of such meeting.

7. If found necessary, the President of the Company may request the General Rules Committee to arrange for a meeting of the entire body of Representatives. Upon such request, the General Rules Committee shall notify the General Chairman of the entire body of Representatives, who will arrange to notify each Representative of the time and place of such meeting.

*Section IV. Regular Monthly Meetings.*

Unless there is insufficient business to warrant calling a meeting, regular meetings will be held each month as follows:

1. The General Committee on Appeals shall meet at 2:30 P. M. on the second Tuesday of each month.

2. The General Committee on Finance shall meet at 1:30 P. M. on the second Tuesday of each month.

3. The General Committee on Rules shall meet at 1:30 P. M. on the third Tuesday of each month.

4. The General Recreation and Housing Committee shall meet at 2:00 P. M. on the first Monday of each month.

5. That the Chairmen of all Committees shall call all meetings to order at the time so stated. All members shall be considered absent that are not present when meeting is called to order.

6. Each Divisional Committee shall arrange to hold not less than one meeting each month of the entire membership of the Committee. A regular time should be set for these meetings which will not interfere with the regularly scheduled meetings of the General Committees.

*Section V. Procedure Governing General Finance Committee.*

1. The General Finance Committee shall be responsible to the Representatives for all expenditures, and will approve and authorize same before any checks may be issued by the Secretary of the general body of Representatives.

2. A petty cash fund of $50.00 is to be maintained at all times against which checks may be drawn by the Secretary of the general body of Representatives to cover such necessary minor expenses as may arise from time to time.

3. A detailed account of all expenditures from the petty cash fund shall be reported to the General Finance Committee each month by the Secretary of the general body of Representatives.

4. The General Finance Committee shall be free to carry out its duties in the best interest of the Employees' Organization. In the event of any controversy or dissatisfaction arising out of, or because of, any action of the General Finance Com-

changes in the Bethlehem plan were made by the representatives. They changed the number of candidates at the primaries from three times the number to be elected to two times that number. (Article IV, § 10.) They created four general committees and provided for the organization thereof. (Article VI, § 1.) These committees for the year 1934 were as follows:

### GENERAL COMMITTEES FOR 1934

#### Appeals Committee

| | |
|---|---|
| J. Larkin, Chairman | C. W. Conn |
| J. J. Young, Secretary | Alex Boag |
| Cal Lyons | George Harris |
| J. Degman | Lloyd McCray |

#### Rules Committee

| | |
|---|---|
| J. Madden, Chairman | R. Congleton |
| J. Weaver, Secretary | Charles Mason |
| Dan Hicks | J. Larkin |

#### Finance Committee

| | |
|---|---|
| Dan Sexton, Chairman | W. Collins |
| H. Kirk, Secretary | George Ferguson |
| C. Stillwell | Carl Means |

#### Recreation and Housing Committee

| | |
|---|---|
| J. Thompson, Chairman | M. Waltz |
| Alex Boag, Secretary | Harry Fray |
| R. B. Buchanan | Burl Baughman |

To diversify the personnel of the various committees, the employees restricted the number of committees on which a representative may serve. (Article VI, § 4.) They divided the mill into 6 divisions with a committee of representatives for each division. They further required that a representative from each divisional committee should be upon each general committee. (Article VI, § 2.) The divisional committees for the year 1934, were as follows:

### DIVISIONAL COMMITTEES FOR 1934

#### Strip Steel Department

| | |
|---|---|
| J. Larkin (Chair.) Roller | J. A. McMahan Asst. Roller 48″ Mill |
| J. McGowan (Sec.) Roll Turner | Chas. Stillwell Cold Mill Roller |
| Kermit Fish Electric Gang Leader | George Harris Resquare Shearman 48″ |
| Dan Reider Old Strip Machinist | James Degman Roller |
| Mel Rothrock Cold Mill Slitterman | Edw. McKenzie Weirite Asst. Roller |
| R. B. Buchanan Hot Mill Recorder | |

#### Steel Works Department

| | |
|---|---|
| B. Fenske (Chair.) Mechanical, Gen. Repairs | R. W. Grace Heater |
| N. Moore (Sec.) Blower, Blast Furnace | Jas. E. Thompson Pit Crane Opr. |
| C. Wm. Conn 1st Helper, Open Hearth | W. G. McConnell Roll Turner Apprentice |
| Wm. Collins 1st Helper, Open Hearth | Wm. Richards Core Maker, Electrical |
| John Foster Charging Mach. Operator | John Weaver Bricklayer |
| | L. L. Lashley Motor Inspector |
| | J. J. Young Head Machinist |

#### Tin Plate Department

| | |
|---|---|
| J. Madden (Chair.) Roller | Ed. Riggins Cold Roll Packer |
| J. Jewitt (Sec.) Asst. Storekeeper | George Costari Cold Roll Polisher |
| Wm. McCarthy Motor Inspector | Harry Kirk Tin Hse Machinist |
| Oscar Thomas Roller | Walter McGee Tinner |
| Cal Lyons Roller | Merel Waltz Weirite Inspector |
| John Gaughan Shearman Checker | |

#### Sheet Mill Department

| | |
|---|---|
| R. Congleton (Chair.) First Rougher | Alex Boag Blacksmith |
| Howard Henry (Sec.) Repairman Galv. Dept. | Dan Sexton Roller |
| | Clarence Nesselrod Slitter Operator |

*mittee, the facts shall be referred to the General Committee on Appeals, and the findings of this Committee shall be final.*

*5. Copies of the minutes of all meetings of the General Finance Committee shall be forwarded regularly to the Secretaries of all Divisional Committees and to the Secretary of the general body of Representatives.*

*Section VI. Resignations and Vacancies.*

*1. Any Divisional Committee may, by a two-thirds vote of its entire membership, request the resignation of a Representative of such Committee, for continued neglect of the duties reasonably expected of a duly elected Representative. When*

*such action is taken, the facts shall be referred to the General Committee on Appeals, and the findings of this Committee shall be final.*

*2. Should the need arise as a result of a Representative vacating office, and should it occur that no alternates are available at the time of such vacancy, the Divisional Committee may select a new Representative from the list of employees who were voted for in the last regular nominations; employees shall qualify in the order of the number of votes polled. In the event of a tie vote, the Divisional Committee shall name the Representative to fill the vacancy.*

**Steubenville Works**

Geo. Ferguson (Chair.)
Doubler

George Harris (Sec.)
Weighmaster

Fred Bray
Doubler

Harry Fray
Car Bracer

Dan Hicks
Machinist Helper

**Clarksburg Works**

Ernie Holt (Chair.)
Heater

Carl Means (Sec.)
Shipping Clerk

Charles Mason
Heater

Lloyd McCray
Machinist

Burl Baughman
Cold Roll Packer

J. Larkin, General Chairman
J. J. Young, General Secretary

They restricted the power of amending the plan to employees. (Article XII.) A general increase or decrease of wages by defendant was required to be referred to the representatives. (Article XIV.) They changed the procedure for meetings and established dates and schedules for joint committee meetings. They centralized procedure by requiring reports of committees and copies of minutes of each committee meeting to be forwarded to the general secretary for the general file of the committee of the whole.

In marked contrast it may be observed the Amalgamated constitution and general laws provide no procedure for calling a joint meeting of the seven lodges at defendant's plants and the employees could not amend that constitution without a referendum by all the lodges in every part of the country, nor could they make any local rules inconsistent with the constitution.

Bearing upon the charge of company domination, the following incident is pertinent and persuasive: Williams, acting under a mistaken impression of defendant's rights, attempted to appoint management's representatives equal in number to the employee representatives on the appeals committee. The men from the management presented themselves but were promptly excluded. Of this incident an employee member of the appeals committee testified:

"We started our Appeals Court off this year * * * and we got all set to go with our Appeals Court, and down comes six company men, they are managers, and so forth, of the men, and we want to know what they was going to do, and they said they was going to vote and hold a meeting.

"We said, 'No, you fellows ain't gonna vote at all', and we got the bylaws wrote up that no company representative can vote, and no representative can be in our meeting while we are voting. * * *

"Q. They never did get a vote on that committee? A. No, sir.

"Q. Did you find out later that that was a misunderstanding? A. Yes, we found out that there was some misunderstanding about that, but nevertheless they did not vote, and we run the show ourselves."

In all controversies between representatives and management, the representatives were fearless and independent. This was fully borne out by their appearance and manner on the witness stand.

A steel mill operates continuously during the week. It is not possible to call a meeting of even a divisional committee without occasioning the withdrawal of some of the representatives and employees from their regular work. The Weirton plan provides that the company shall pay the representatives for the time spent on representative duties occasioning absence from regular work. Certainly representatives should not be penalized by loss of wages. There can be no objection to the manner of compensation. The defendant also paid a flat fee of $25 a month to each of the 49 representatives. Most employee representative plans provide that representatives be paid at their regular rate of pay for time spent in the performance of their duties. When they attend meetings on their own time, some fair objection might be made to continuing their regular hourly or tonnage rates. When two employees are doing the same kind of work in representing fellow-workmen, there is no reason why a representative receiving high wages should be paid more than a representative receiving low wages. Their ability as representatives may be equal. For this reason, the representatives themselves demanded a flat rate for their work when acting as representatives on their own time and demanded of the management $25 per month. The company granted the demand, recognizing it prevented inequalities and insured against partiality. This fee of $25 appears entirely reasonable. In practically every instance it is less than the regular wages of the representative for a like period of time spent at his regular work. Fifty-seven witnesses testified that it was less than fair compensation for the time and work spent. There is no evidence that anybody was influenced thereby. It should always be borne in mind that each divisional committee has the pow-

er of recalling its representative and that any one false to his trust would fail of re-election. At the beginning of the year defendant also pays to the finance committee of the employees 50 cents for each employee eligible to vote at the December elections. This affords a general fund of approximately $6,000 for printing ballots, forms, posters, and copies of the plan. It also provides for employment of lawyers and the expenses of investigating other plants for the purpose of comparing rates of pay and working conditions. Paying money to a committee of the men instead of requiring each particular disbursement to be submitted to the company for approval contributes to the independence of the representatives. The total expense of the representative plan is about $27,000 a year. The yearly pay roll of defendant averages $15,000,000. It is not unreasonable to apply less than one-fourth of 1 per cent. of the pay roll to preserve harmony between management and men when it affirmatively appears no evil results therefrom.

For over a year the Bethlehem and Weirton plans have been in operation at defendant's plants and hundreds of small complaints were adjusted by the representatives of the employees with some foreman. Before January 1, 1934, grievances of a more serious nature were reported to and considered by the divisional committees. The divisional committee, if the grievance was deemed just, classified it as pertaining to wages, hours, or working conditions, and it was so recorded on the minutes of the committee. Thereupon the divisional committee dealt with the management in an effort to adjust the complaint. If unsuccessful, an appeal was carried to the appeals committee. After January 1, 1934, the representatives adopted a more formal procedure by the use of printed forms ER-1 and ER-2 (employee representative). A complaint or grievance is first brought by some representative to the attention of his divisional committee. If the committee finds the complaint just, either the representative or the committee embodies it in form ER-1. This form is filled out in quadruplicate— blue, white, yellow, and pink copies. The blue copy is filed with the secretary of the committee. The white, yellow, and pink copies are given to the management representative, usually the chief clerk of the department where the grievance arose. The chief clerk delivers the pink copy to the industrial relations department and the white copy to the manager of the department who transmits it to the general superintendent, who in turn returns it with recommendations indorsed thereon to the chief clerk. The yellow copy is retained by the chief clerk until receipt of the white copy. The yellow copy is then filled out and sent to the industrial relations department. That department fills out the pink copy and returns it to the chief clerk for filing. Thus we have the white copy filed with the secretary of the committee of 49 representatives, the pink copy filed with the chief clerk of the department, the yellow copy filed with the industrial relations department, and the blue copy remains with the secretary of the divisional committee. If the management has turned down the complaint stated on ER-1, the procedure provides that the complaint may be stated on ER-2 and taken to the appeals committee where it is considered and submitted for reconsideration to the management. It is perfectly apparent that the employees of defendant have worked out a systematic procedure for adjusting their grievances and complaints with the management. It is equally apparent that the procedure is controlled by the employees and is in no way dominated by defendant.

The plans of employee representation at defendant's plants proved effective and satisfactory. Up to October 1, 1934, 1,040 cases were dealt with by representative committees. Of these, 545 related to wages, 84 to safety, and 411 to working conditions. Six hundred ninety-seven were settled in favor of the employees, 124 in favor of the management, 62 were withdrawn, and 157 were pending. The plans were effective in negotiating general demands affecting all employees as well as demands affecting groups or individual employees. In January, 1934, the steel works department demanded a general raise of wages. It was taken up by the committee of 49 representatives and Weir agreed to submit the demand to the executives of other steel companies. The demand was refused by the executives. However, the 49 representatives were insistent and demanded that defendant raise the wages at Weirton. After further negotiations, defendant acceded to the demands of the committee of 49 representatives and in March so advised the committee. Afterwards, Weir informed the industry of the action of his company and a general 10 per cent. increase throughout the industry resulted.

The constitution and general laws of the Amalgamated Association is in marked contrast to the Weirton plan of employee repre-

sentation and the whole-hearted support which it receives from defendant's employees. Sander, a teller and member of the canvassing board of the Amalgamated Association, testified that only 17,996 steel workers throughout the United States were eligible to vote in the election of officers of the association in 1934. Out of this number only 5,319 exercised their right to vote. Michael Tighe, president of the association, was the choice of only 2,789. Sander's testimony also showed that there were only 183 employees of defendant eligible to vote in 1934. It is absurd that officers chosen by 183 employees of defendant should be the representatives of 12,000 employees.

### Conclusions from Evidence.

The manufacturing operations conducted by defendant in its various plants or mills do not constitute interstate commerce. The relations between defendant and its employees do not affect interstate commerce. Manufacture is a co-operative enterprise. Production in quantity and quality with consequent wages, salaries, and dividends depends upon a sympathetic co-operation of management and workmen. A relation acceptable and satisfactory to both workmen and management is an essential feature of the enterprise. If satisfactory, the court will not disturb it. It is said this relation involves the problem of the economic balance of the power of labor against the power of capital. The theory of a balance of power or of balancing opposing powers is based upon the assumption of an inevitable and necessary diversity of interest. This is the traditional old world theory. It is not the Twentieth Century American theory of that relation as dependent upon mutual interest, understanding, and good will. This modern theory is embodied in the Weirton plan of employee organization. Furthermore, the suggestion that recurrent hard times suspend constitutional limitations or cause manufacturing operations to so affect interstate commerce as to subject them to regulation by the Congress borders on the fantastic and merits no serious consideration.

By a clear preponderance of evidence this court finds that the plan of employee representation in effect among the employees of the defendant affords a lawful and effective organization of the employees for collective bargaining through representatives of their own choosing; that in all respects it complies with the provisions of section 7 (a) of the National Industrial Recovery Act and section 1, article IV, of the Steel Code; that in all respects it is directly operated and controlled by defendant's employees and is not dominated or controlled by defendant or its agents; that in all respects it is satisfactory to the great majority of defendant's employees; that the 49 representatives elected in December, 1933, are free from any domination or control of defendant or its agents; and that the payment of compensation by defendant to the representatives and the payment by defendant of the expenses of operating the plan are lawful and do not constitute acts of interference, restraint, or coercion.

### Constitutionality of Section 7 (a) as Applied to Defendant's Business.

The National Steel Corporation is not the defendant in this suit. It is true that part of the business of that corporation is interstate commerce. Weirton Steel Company is the sole defendant in this suit. Its business is the manufacture of iron and steel products. Defendant is not engaged in interstate commerce save to a negligible extent. In its relations to its employees as dealt with in section 7 (a) it is not engaged in interstate commerce. Those relations are incident to manufacture. The fact that defendant is a wholly owned subsidiary of National Steel Corporation cannot change the character of defendant's business from that of manufacture to commerce. Therefore in considering the question of the constitutionality of section 7 (a) the business and corporate structure of the National Steel Corporation is immaterial.

Power to enact section 7 (a) was not conferred upon Congress by the "general welfare" recital in the Preamble to the Constitution, nor by the "welfare clause," article 1, § 8, cl. 1, of the Constitution. The Preamble confers no power and the welfare clause is commonly considered as a specification of the purpose for which money may be appropriated and not as a substantive grant of power. The enactment of section 7 (a) either is authorized by the commerce clause of the Constitution or it is unauthorized and therefore void. Article 1, § 8, cl. 3, provides: "The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

The National Industrial Recovery Act requires that every industrial code shall contain the provisions of section 7 (a). Sub-

section (1) assures to employees the right to organize and bargain collectively through representatives of their own choosing free from interference, restraint, or coercion of their employers. Subsection (2) bans yellow dog contracts. Subsection (3) refers to maximum hours of labor and minimum rates of pay. With the last we have nothing to do.

Collective bargaining and the banning of yellow dog contracts were not new features of congressional legislation. The Transportation Act 1920, § 301, 41 Stat. 469, provides: "It shall be the duty of all carriers and their officers, employees, and agents to exert every reasonable effort and adopt every available means to avoid any interruption to the operation of any carrier growing out of any dispute between the carrier and the employees or subordinate officials thereof. All such disputes shall be considered and, if possible, decided in conference between representatives designated and authorized so to confer by the carriers, or the employees or subordinate officials thereof, directly interested in the dispute."

The Railway Labor Act of 1926 (section 2, subd. 3, 44 Stat. 577 [see 45 USCA § 152, subd. 3]) provides: "Representatives, for the purposes of this Act, shall be designated by the respective parties in such manner as may be provided in their corporate organization or unincorporated association, or by other means of collective action, without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other."

The Norris-LaGuardia Act of 1932 (section 2 [29 USCA § 102]) declares: " * * * It is necessary that he [the worker] have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. * * *"

These earlier statutes reflect a purpose on the part of Congress to induce and maintain united action of labor and management in the operation of interstate carriers and thus to prevent the interruption of interstate commerce by labor disputes and strikes. By section 7 (a) of the National Industrial Recovery Act, this united action secured "under adequate Governmental sanction and supervision" is sought to be projected and transplanted into every industry.

The National Industrial Recovery Act provides machinery for the formulation and enforcement of voluntary or prescribed codes and agreements relating to every branch of industry. On October 19, 1934, there were over 2,400 lines of industry covered by codes then approved. These codes include not only great manufacturing industries such as the steel code, automobile code, and textile code, but also include the bankers' code, hotel code, newspaper code, undertakers code, and baby carriage code. They bring within their scope the entire economic life of the country.

In a number of cases the Supreme Court has declared that the commerce clause of the Constitution cannot be construed to bring within the regulatory power of Congress the entire industrial life of the nation. In Kidd v. Pearson, 128 U. S. 1, 20, 9 S. Ct. 6, 10, 32 L. Ed. 346, the court held a statute of Iowa to be constitutional which prohibited the manufacture of liquor intended to be sold in interstate shipment. The court said: "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. The legal definition of the term, as given by this court in County of Mobile v. Kimball, 102 U. S. 691, 702 [26 L. Ed. 238], is as follows: 'Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that congress would be invested, to the exclusion of the states,

88

with the power to regulate, not only manufactures, but also agriculture, horticulture, stock-raising, domestic fisheries, mining,—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat-grower of the northwest, and the cotton-planter of the south, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in congress and denied to the states, it would follow as an inevitable result that the duty would devolve on congress to regulate all of these delicate, multiform, and vital interests,—interests which in their nature are, and must be, local in all the details of their successful management. It is not necessary to enlarge on, but only to suggest, the impracticability of such a scheme, when we regard the multitudinous affairs involved, and the almost infinite variety of their minute details."

The very thing so emphatically condemned by the Supreme Court is what has been attempted by means of section 7 (a) of the Recovery Act and the Codes approved thereunder.

Hammer v. Dagenhart, 247 U. S. 251, 272, 38 S. Ct. 529, 531, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, relates to the manufacture of goods by child labor in the state of North Carolina. The court distinguished the case from the cases upholding the lottery statute, the White-Slave Traffic Act (18 USCA §§ 397–404), and the Food and Drug Acts (21 USCA § 1 et seq.) on the ground that North Carolina had not forbidden child labor and the goods themselves were not contraband or injurious. The court said: "The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped, or used in interstate commerce, make their production a part thereof. Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397. Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation. 'When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.' Mr. Justice Jackson in Re Greene (C. C.) 52 F. 113. This principle has been recognized often in this court. Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. Ed. 615, and cases cited. If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the states. Kidd v. Pearson, 128 U. S. 1, 21, 9 S. Ct. 6, 32 L. Ed. 346."

This is a clear and emphatic statement that the commerce clause cannot be construed so as to bring within the regulatory power of the federal government the manufacture of goods intended for shipment in interstate commerce and a fortiori the entire economic life of the nation.

Heisler v. Thomas Colliery Co., 260 U. S. 245, 259, 43 S. Ct. 83, 86, 67 L. Ed. 237, involves the constitutionality of a statute of Pennsylvania imposing a tax upon each ton of coal prepared for market. Eighty per cent. of the coal was shipped outside of the state and defendant contended this portion of the coal was within the realm of interstate commerce and could not be taxed by the state without interfering with the regulatory power of Congress. In rejecting this contention, the court said: "The reach and consequences of the contention repels its acceptance. If the possibility, or indeed certainty of exportation of a product or article from a state determines it to be in interstate commerce before the commencement of its movement from the state, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. It would nationalize all industries; it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other states at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined because they are in varying percentages destined for and

surely to be exported to states other than those of their production."

In the Employers' Liability Cases, 207 U. S. 463, 502, 28 S. Ct. 141, 147, 52 L. Ed. 297, the court dealt with a statute which subjected all the business of an interstate carrier to regulation by Congress although much of that business was intrastate such as the work at railroad repair shops. In holding the statute unconstitutional the court said: "It remains only to consider the contention which we have previously quoted, that the act is constitutional although it embraces subjects not within the power of Congress to regulate commerce, because one who engages in interstate commerce thereby submits all his business concerns to the regulating power of Congress. To state the proposition is to refute it. It assumes that, because one engages in interstate commerce, he thereby endows Congress with power not delegated to it by the Constitution; in other words, with the right to legislate concerning matters of purely state concern. It rests upon the conception that the Constitution destroyed that freedom of commerce which it was its purpose to preserve, since it treats the right to engage in interstate commerce as a privilege which cannot be availed of except upon such conditions as Congress may prescribe, even although the conditions would be otherwise beyond the power of Congress. It is apparent that if the contention were well founded it would extend the power of Congress to every conceivable subject, however inherently local, would obliterate all the limitations of power imposed by the Constitution, and would destroy the authority of the states as to all conceivable matters which, from the beginning, have been, and must continue to be, under their control so long as the Constitution endures."

The reductio ad absurdum process of reasoning of the Supreme Court—that regulating manufacture involves the regulation of all industry—was held to demonstrate the conclusion that the Constitution did not give to Congress the power to regulate manufacture. The authority of these four cases of the Supreme Court stands and must continue to stand until the Constitution is amended. Their application to the business of defendant is quite certain. How then does the government endeavor to escape the application of this authority? The path pursued is somewhat devious. The Supreme Court has held certain stockyards and a certain grain exchange subject to regula-

tion by the Congress under the commerce clause because they are instrumentalities of commerce and because their business interferes with or imposes a burden upon the stream, current, or flow of that commerce. In the reasoning of these cases the court repeatedly employs the figure of speech— "stream," "current," and "flow" of commerce. Applying this language to defendant's business and assimilating the facts of defendant's business to the facts of those cases, the government pictures the raw materials, like ore, coal, and limestone transported across state lines into defendant's plants, and, after a complete transformation incident to the processes of manufacture during a substantial period of time pictures, the finished products like structural steel and tin plate transported across state lines to customers. In defendant's business the government sees a stream, current, or flow of ore, coal, or limestone through defendant's plants emerging in the form of finished products to be shipped across state lines to customers. Adopting this figure of speech as applicable to defendant's business the government contends that the business of defendant and of the stockyards and exchange are essentially the same and subject to Congressional regulation. A cursory examination of the cases where the Supreme Court uses this figure of speech exhibits the peculiar facts upon which the cases rest and clearly distinguish them from the case in hand.

Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518, and Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 402, 66 L. Ed. 735, 23 A. L. R. 229, are referred to as the "stockyard" cases. The court held in these cases that the buying and selling in the stockyards is a mere incident of the interstate journey of the cattle and hogs which begins at the farms, passes through the stockyards and ends at the final destination in other states. This destination is fixed by the buying and selling of commission men and dealers at the stockyards. The buying and selling merely determines the ultimate destination of an interstate journey previously begun, is merely an incident of that journey, and takes place without any practical interruption of the journey.

In Stafford v. Wallace, the authority on which the government principally relies, the court in effect held that the stockyard is an instrumentality of interstate movement of live stock and that both the stockyard and

what is incidentally done therein is a part of interstate commerce subject to regulation by Congress under the commerce clause. The court said: "The stockyards are not a place of rest or final destination. Thousands of head of live stock arrive daily by carload and trainload lots, and must be promptly sold and disposed of and moved out, to give place to the constantly flowing traffic that presses behind. The stockyards are but a throat through which the current flows, and the transactions ·which occur therein are only incident to this ′current from the West to the East, and from one state to another. Such transactions cannot be separated from the movement to which they contribute and necessarily take on its character. The commission men are essential in making the sales, without which the flow of the current would be obstructed, and this, whether they are made to packers or dealers. The dealers are essential to the sales to the stock farmers and feeders. The sales are not in this aspect merely local transactions. They create a local change of title, it is true, but they do not stop the flow; they merely change the private in-′ terests in the subject of the current, not interfering with, but, on the contrary, being indispensable to, its continuity. The origin of the live stock is in the West; its ultimate destination,. known to, and intended by, all engaged in the business, is in the Middle West and East, either as meat products or stock for feeding and fattening. This is the definite and well-understood course of business. The stockyards and·the sales are necessary factors in the middle of this current of commerce."

The stockyards do not originally cause the interstate movement of live stock to take place through the yards. Their contribution as aids to the interstate movement may increase the amount of commerce. The stockyards themselves and the clearing that takes place therein are a part of the interstate movement itself. On the other hand, the plants of the defendant are not a part of the interstate movement of goods. The plants are the cause of the interstate movement of goods. They originate interstate commerce. It is because these plants con· sume raw materials and ship out finished goods that interstate commerce is created.

Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839, involves the constitutionality of the Grain Futures Act of 1922 (7 USCA § 1 et seq.). This act regulates transactions on boards of trade where grain is sold for actual or future delivery. When sales were for actual delivery, the court found that the board of trade and the persons buying and selling thereon performed a function substantially similar to the stockyards and were governed by the stockyard cases. Furthermore, the court accepted the findings of Congress that the manipulations of boards through dealers in futures imposed a direct burden upon interstate commerce in grain and held that Congress was authorized to regulate such dealings. There is no analogy between the Olsen Case and the case at bar. Here the raw materials brought into defend-· ant's plants are never shipped out. No ore, coal, limestone, or scrap iron is shipped out into interstate commerce. What is shipped out are things entirely different from the raw materials shipped in. The finished products are produced by extended manufacturing operations involving mechanical, chemical, and electrolytic processes. If defendant's manufacturing plants and manufacturing operations are to be regarded as instruments for the interstate movement of goods, it follows that practically all of the manufacturing industry of the United States would be brought within the control of the federal government. Such result has received the unqualified condemnation of the Supreme Court.

■ There is no showing on the part of plaintiff warranting the court in issuing an injunction. Section 7 (a) as applied to defendant and its business is unconstitutional and void.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½ (28 USCA § 723).

The bill must be dismissed.